521 So.2d 890 (1988)
Joe Milton WASH
v.
STATE of Mississippi.
No. 57542.
Supreme Court of Mississippi.
March 2, 1988.
*891 Edmund D. Phillips, Jr., Newton, for appellant.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by DeWitt Allred, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and PRATHER and GRIFFIN, JJ.
DAN M. LEE, Presiding Justice, for the Court:
Joe Milton Wash was indicted by the grand jury of Newton County, Mississippi, on March 25, 1986, for armed robbery and convicted by a jury of the Circuit Court of Newton County on April 14, 1986. On April 16, 1986, he was sentenced by the Hon. Marcus D. Gordon to a prison term of 30 years. On April 18, 1986, a hearing was *892 held on his motion for new trial and the motion was overruled. From this conviction and sentence he appeals, assigning the following errors:
I. The Court Erred in Failing to Grant Appellant's Motion for Change of Venue and in Failing to Permit Testimony in Behalf of Said Motion.
II. The Court Erred in Failing to Suppress the In-Court Identification of the Appellant by Wilson Blalock and the Testimony that Wilson Blalock Identified Appellant's Photograph as That of His Assailant and Identified Appellant as His Assailant in the Show-up.
III. The Verdict is Against the Overwhelming Weight of the Evidence.
IV. The Court Erred in Denying Appellant's Motion to Set Aside the Verdict of Jury and Grant New Trial on the Grounds that a Juror Took with Her into the Jury Room Handwritten Notes Taken by Her During the Trial.
For reasons stated hereinafter, we affirm.

FACTS
On October 16, 1985, Wilson Blalock, age 67, returned to his trailer with a friend, Freeman Irving, age 85, who was staying with him until his upcoming eye surgery. Mr. Irving was blind at the time. Mr. Blalock left his trailer at around 4:00 p.m. and returned about 6:00 p.m. Upon his return Mr. Blalock started to repair a broken shelf in the kitchen and then headed for his bedroom to look for a hammer. He was met in the hallway by a man who came out of the bedroom with a claw hammer belonging to Mr. Blalock; the man began hitting him. The two of them scuffled around; the man then called for "Joe" to come help, specifically to bring a blanket to put over Blalock's head. The other man had a paper bag on his head, but Mr. Blalock got a good look at the man who was hitting him. The wounds to Mr. Blalock's head required 26 stitches.
After his assailants left, Mr. Blalock went to the sheriff's office to report the incident. The deputy sheriff brought out a stack of photographs and Blalock picked up the top one and immediately identified it as that of his assailant. The photograph was of Joe Wash. Blalock refused to look at any other pictures. Later, while Mr. Blalock was still at the police station waiting for the doctor, officers brought in two young black males. Mr. Blalock picked out Joe Wash as his assailant.
At trial Mr. Blalock identified Wash in court as his assailant. Mr. Blalock testified that his wallet was taken with his credit cards and drivers license. He identified his wallet in court and also identified the dark corduroy pants and blue shirt of his assailant. Mr. Blalock then testified as to the photo identification and the show-up identification of Wash, stating that he was able to identify Wash's picture and later Wash himself, based on what he saw during the incident at his trailer. He stated he never could identify the man with the paper bag over his head.
R.V. (Butch) Williams testified that Joe Wash and two of his friends had come by his grandfather's house, where he was staying, on October 15, around 3:30 p.m. Wash asked him at that time where Wilson Blalock lived. Blalock lived a quarter mile from Williams' grandfather's house. On Thursday, October 17, Wilson Blalock picked up Williams up as he was walking to town and told him about the robbery. He told Butch that it was too dark for him to see anything.
Sandra Brown saw Joe Wash on October 16 between 4:30 and 5:00 p.m. She identified the pants, shirt, and tennis shoes presented to her in court as those Wash wore when she saw him. She also testified that on March 31, at another hearing in connection with this case, she was sitting by Wilson Blalock in a courtroom. Wash was sitting in front of them. Blalock asked her who the black man was. She said he acted like he did not recognize him. She told him that it was Wash, "the man you said hit you." Mr. Blalock stated that Mr. Wash's sideburns were shorter now.
*893 Ron Davis, deputy sheriff of Newton County, testified about the photo identification and the show-up. He also testified that on Thursday morning, October 17, he drove out to Blalock's home. On a dirt road north of Blalock's trailer, he found tennis shoes and pants. On Highway 494, just off the dirt road, he found a shirt. Davis also found Blalock's wallet on the paved road in front of Blalock's home. He also testified that Wash has changed his hairdo since the night of the incident, and that Wash is cleaner shaven now than he was at that time. Davis stated that he took no fingerprints at the trailer.
Oliver Larkin was the state's key witness. He testified that he was with Wash and Ricky Glenn on October 15 when they went to see Butch Williams. He was also with Wash on October 16 when they went to see Sandra Brown. After leaving Ms. Brown's house, Wash asked Larkin to drop Glenn and him off about a quarter mile from Blalock's trailer. At trial Larkin identified the shirt, pants and tennis shoes that the defendant was wearing. He returned to the same area around 6:30 that evening and picked up Wash and Ricky Glenn. At the request of Wash, he threw Wash's tennis shoes, pants and shirt out the car window. After he was arrested Glenn took the police out and showed them where they were thrown. He also testified that Wash's hair was shorter now than it was then. Larkin was found not guilty on the Blalock robbery. The district attorney told him he would not prosecute him as an accessory after the fact if he testified at Wash's trial.
Sheriff Bud Miles established the chain of custody of the pants, the shirt, the shoes and the wallet. He also testified that he found the claw hammer on the paved road by Blalock's house. The shirt and shoes had blood stains on them when he first received them, as did the hammer.
The defense offered the testimony of Josephine Wash, defendant's mother. She said her son was on the corner by their house at 5:30 p.m. on October 16. He then passed by the house walking with his friends. She then heard and saw him shooting at some dogs in a ditch by their house. After that he came into the house until almost 7:00 and visited with his sister. She could not identify the pants and shirt and tennis shoes as belonging to Joe Wash.
Juanita Merle, Wash's aunt, lives next door to Wash's mother. She saw Wash just before 6:00 p.m. on October 16 walking past her house from the corner to the ditch. She then saw him come back by and go into his mother's house about 6:00 p.m. Ricky Glenn and Oliver Larkin were with him. Joe Wash did not testify in his own defense.

I.

The Court Erred in Failing to Grant Appellant's Motion for a Change of Venue and in Failing to Permit Testimony in Behalf of Said Motion.
Wash filed a motion for change of venue, but did not call the motion to the trial court's attention and did not request a hearing on the motion until after completion of voir dire, after selection of the jury, and after both sides had announced "ready for trial." The trial judge declined to consider the motion because Wash "didn't give the court and state an opportunity to pursue that in its voir dire." He did allow Wash to make a proffer of the testimony of five people who would testify as to public sentiment against Wash due to a newspaper article which appeared in the Newton Record, a local paper with a circulation of 3800-4000. Wash also wished to offer the article into evidence. Wash's motion contained affidavits of two people stating that because of the newspaper article, Wash could not receive a fair trial in Newton County.
In Johnson v. State, 476 So.2d 1195, 1210 (Miss. 1985), this Court stated "[t]he accused's right to a change of venue is clearly not self-executing; the defendant must file a motion supported by the affidavits of two witnesses with knowledge." Wash has complied with the initial requirement of filing his motion with two affidavits. Johnson continues that the filing of the motion with its two affidavits raises "a presumption that such sentiment exists; *894 and, the state then bears the burden of rebutting that presumption. It is evident that this presumption may be rebutted during voir dire, as is indicated in the Fifth Circuit case of United States v. Harrelson, 754 F.2d 1153 (5th Cir.1985)...."
We reiterate today what we said in Johnson  the right to a change of venue is not self-executing. Here, Wash took the initial step of filing his motion with two affidavits; however, it was too late to urge a change of venue after the jury has been selected. By participating in the jury selection without bringing on for hearing his motion for change of venue, Wash may have waived his right to request the state to rebut the presumption. Waiting until after the jury is selected to request a hearing further suggests a waiver of the state's necessity to comply with Johnson to rebut the presumption. Once a motion is filed in compliance with the requirements set out in Johnson, a hearing on the motion should be held, if timely requested, before the jury is selected.
We note, also, that the trial judge, in overruling Wash's request for a hearing, did consider Wash's proffered testimony. Taking that testimony as being true, the trial court found that Wash did not meet the criteria for a change of venue as set out in Johnson. We agree. Under the Johnson guidelines, first, a heightened state of review is required when defendant's life is at stake. Wash's is not a death penalty case. Second, there is no evidence of hostile crowds threatening violence toward Wash. Third, the media coverage does not appear to be extensive, since only one article appeared in the local paper. Fourth, while this is a serious crime, there is no evidence that it was against members of a prominent community family or public official; neither is this crime part of a series of crimes or mass crime. In short, Wash has not met the Johnson criteria.
The lower court did not err in declining to hear the motion for a change of venue after the jury had been selected. The lower court likewise did not err in finding, based on Wash's proffered testimony, that Wash failed to meet the criteria for a change of venue. Therefore, this assignment of error is without merit.

II.

The Court Erred in Failing to Suppress the In-Court Identification of the Appellant by Wilson Blalock and the Testimony that Wilson Blalock Identified Appellant's Photograph as that of His Assailant and Identified Appellant as His Assailant in the Show-Up.
Wash moved to suppress the in-court identification of him by Wilson Blalock, to suppress testimony that Blalock identified Wash's photograph, and to suppress testimony that he identified Wash at a show-up. During the suppression hearing, the evidence showed that after the assault, Mr. Blalock drove to the sheriff's office, before he received medical attention, to report the robbery. He described his assailant to the deputy, whereupon the deputy handed him a stack of photos. Blalock immediately identified the top photograph as that of his assailant. The picture was of Joe Wash. The deputy obtained a warrant and had Wash arrested. Later, Blalock was still at the station when they brought in Wash and Ricky Glenn. Blalock immediately identified Wash when he saw him. He could never positively identify the one with the paper bag over his head. Wash claims that both pre-trial identification procedures were suggestive, in violation of his Fourteenth Amendment right to due process. The trial judge overruled a motion to suppress based on Blalock's testimony that he got a good look at his assailant while they were scuffling. These two identification procedures will be analyzed in turn.

A. Scope of Review of Trial Court Suppression Hearing Findings

This Court has stated its scope of review of suppression hearing findings in pre-trial identification cases as follows:
The combined effect of the circuit court's pre-trial and trial rulings is that of a finding of fact that under the totality of the circumstances ... in-court identification testimony had not been impermissibly *895 tainted. We may, of course, disturb such a finding only where there is an absence of substantial credible evidence supporting it. [emphasis added]
Ray v. State, 503 So.2d 222, 224 (Miss. 1986). Therefore, this Court must determine if, in this case, there is substantial credible evidence supporting the trial judge's findings.

B. The Photographic Display

The "Wade trilogy" and its progeny are the guidelines this Court follows in determining the competency of identification testimony. York v. State, 413 So.2d 1372, 1374 (Miss. 1982). York is the leading case in Mississippi on this issue and has been followed by this Court on numerous occasions. See, e.g., Davis v. State, 510 So.2d 794 (Miss. 1987); White v. State, 507 So.2d 98 (Miss. 1987); Jones v. State, 504 So.2d 1196 (Miss. 1987); Smith v. State, 492 So.2d 260 (Miss. 1986). As pointed out in York, there are two lines of analysis when considering pre-trial identifications: the Fourteenth Amendment due process analysis and the Sixth Amendment right to counsel analysis. Wash raised only the due process argument at the suppression hearing, claiming that the photographic display was suggestive.
The concern with the photographic display is that Mr. Blalock immediately picked out the top photograph on the stack as that of his assailant, and refused to look at any other pictures. There was some suggestion during cross-examination that the deputy had intentionally placed Mr. Wash's photograph on the top of the stack; however, Deputy Davis adamantly denied this. Mr. Blalock also stated that he did not give Deputy Davis any information as to who he thought his assailant was, but only described him in general terms. He also testified at the suppression hearing that he was able to pick out the photograph based on his ability to get a good look at his assailant at the time of the incident. The trial judge found that simply because Mr. Blalock considered it unnecessary to look at the remaining photographs does not indicate a suggestive procedure at all. We agree with the trial judge that this procedure was not suggestive and did not impermissibly taint the in-court identification.

C. The Show-Up

Wash claims that the show-up which occurred at the sheriff's station after Mr. Blalock's photo identification was impermissibly suggestive. In York, 413 So.2d at 1383, we stated: "A show-up in which the accused is brought by an officer to the eyewitness is ... impermissibly suggestive where there is no necessity for doing so," citing Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). There was no necessity shown in the present case for the one-on-one show-up. Therefore, the show-up in this context may have been impermissibly suggestive.
However, an impermissibly suggestive pre-trial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure unless "(1) from the totality of the circumstances surrounding it, (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." York at 1383, citing Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and Simmons v. U.S., 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). York continues that "even if testimony is proffered of the out-of-court identification itself" as was done in this case, the same standard applies, except with the omission of the word "irreparable," a slightly higher burden of proof for the state. York at 1383, citing Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). York goes on to set out the Neil factors to consider in determining whether these standards have been fulfilled:
1. Opportunity of the witness to view the accused at the time of the crime;
2. The degree of attention exhibited by the witness;
3. The accuracy of the witness's prior description of the criminal;

*896 4. The level of certainty exhibited by the witness at the confrontation;
5. The length of time between the crime and the confrontation.
York at 1383; Neil, 409 U.S. at 199, 93 S.Ct. at 382. See also Ray v. State, 503 So.2d at 223.
Applying these factors to the present case,
1. Opportunity to view the accused. Mr. Blalock had ample opportunity to view his assailant during the 15-20 minutes that they struggled in his trailer.
2. Degree of attention. Being within close range of his assailant for 20 minutes suggests that Mr. Blalock paid close attention to his assailant who was threatening to hit him with a claw hammer.
3. Accuracy of prior description. The record is devoid of any description which Mr. Blalock offered to the sheriff's department when he reported the incident. He was, however, able to identify the shirt, pants, and tennis shoes which his assailant wore.
4. Witness's level of certainty at confrontation. Upon Wash's arrival at the sheriff's station, Mr. Blalock immediately identified him as his assailant.
5. Length of time between the crime and the confrontation. The confrontation occurred within an hour of the incident.
There is substantial credible evidence to support the trial court's determination that there was no substantial likelihood of irreparable misidentification in allowing the in-court identification, nor was there substantial likelihood of misidentification in allowing the testimony of the out-of-court identification itself. This aspect of Mr. Wash's assignment of error is without merit.

III.

The Verdict is Against the Overwhelming Weight of the Evidence.
In this assignment of error Mr. Wash argues that the jury verdict was against the weight of the evidence because the victim identification testimony lacks credibility. He raised this issue in his motion for directed verdict at the close of the state's evidence and again on motion for j.n.o.v. or new trial, all being overruled.
This Court has often stated the limitations upon its scope of review of a jury's findings of fact. In Billiot v. State, 454 So.2d 445, 463 (Miss. 1984), the Court stated, "the jury is the sole judge of the credibility of witnesses, and the jury's decision based on conflicting evidence will not be set aside where there is substantial and believable evidence supporting the verdict." Id. at 463. Further, in Kinzey v. State, 498 So.2d 814 (Miss. 1986), this Court stated, "the credibility of the witnesses at trial is not a matter for the reviewing court's evaluation." Id. at 818. Where the verdict turns on the credibility of conflicting testimony and the credibility of the witnesses, it is the jury's duty to resolve the conflict. Gandy v. State, 373 So.2d 1042, 1045 (Miss. 1979); Shannon v. State, 321 So.2d 1, 2 (Miss. 1975); Bond v. State, 249 Miss. 352, 357, 162 So.2d 510, 512 (Miss. 1964). The jury's findings will not be disturbed by this Court unless the verdict is so contrary to the overwhelming weight of the evidence that "to allow it to stand would sanction an unconscionable injustice." Pearson v. State, 428 So.2d 1361, 1364 (Miss. 1983); Groseclose v. State, 440 So.2d 297 (Miss. 1983). See also Russell v. State, 506 So.2d 974, 977 (Miss. 1987); Shive v. State, 507 So.2d 898, 900 (Miss. 1987); Johnson v. State, 511 So.2d 1360, 1367 (Miss. 1987).
Since the evidence turned on whether or not the victim was telling the truth about the identity of his assailant, the jury's duty was to determine the credibility of this witness. This assignment of error is without merit.

IV.

The Court Erred in Denying Appellant's Motion to Set Aside Verdict of Jury and Grant New Trial on the Grounds that a Juror Took with Her into the Jury Room *897 Handwritten Notes Taken by Her During the Trial.
One of the jurors took notes during the trial, unobserved by either the prosecuting attorney or defense counsel until the verdict was returned. The court clerk spotted the notes when the jury returned to deliver the verdict. Wash raised this issue in his motion for a new trial and the trial judge held a hearing on the matter. The juror involved testified that she works with the Social Security Administration and is trained to take notes as to pertinent and discrepant evidence. She did take the notes to the jury room with her and condensed them onto a second sheet of paper in the jury room. No one else saw the notes and she did not refer to them again or read from them during deliberations. They were merely for her personal use in keeping evidence straight. The trial judge found that the defendant suffered no prejudice and overruled his motion for new trial.
Wash argues that the use of these notes during jury discussion may skew the jury's entire interpretation of the facts to the perspective of the juror who took notes. He urges that a trial transcript would be the only accurate notes to carry into the jury room. Anything less, he argues, distorts recall if used in jury discussions and thus has the potential for an unjust verdict. He submits that jurors' notes function as an exhibit without meeting the required standards.
The trial judge was put in the position of making a post hoc ruling on this issue since the note-taking was not spotted until after the verdict was delivered. The question thus presented to the trial court was not whether jurors should be permitted to take notes, but whether the facts of this case warranted the ordering of a new trial. The judge did not abuse his discretion in not granting a new trial. Therefore, this assignment of error is without merit.
As to the propriety of jurors taking notes, there is a division among state courts. The majority of jurisdictions that have ruled on the issue find that it is not improper. 14 A.L.R.3rd 831, § 3(a) and cases collected therein. There is a minority that finds the practice improper. 14 A.L.R.3rd 831, § 3(b) and cases collected therein. However, whether or not a jurisdiction permits the practice or whether or not the jurisdiction has ever ruled on the issue, few find it reversible error where the trial judge prohibits it or permits it  in other words, the decision is essentially left to the discretion of the trial judge, 14 A.L.R.3rd 831, § 5.
In the Federal court system it seems to be settled that it is within the sound discretion of the trial judge to allow jurors to take notes during the trial and to use them during deliberations. See United States v. Johnson, 584 F.2d 148, 157-58 (6th Cir.1978), cert. denied, 440 U.S. 918, 99 S.Ct. 1239, 59 L.Ed.2d 469 (1979), and cases collected therein; United States v. Pollack, 433 F.2d 967 (5th Cir.1970).
We discussed this issue briefly in our recent decision in Nixon v. State, DP-65 (decided November 25, 1987, not yet reported). In that case, the jurors were permitted to take notes and the trial judge and defense attorneys agreed upon a jury instruction which informed the jurors that the notes were to be used only by the juror who took them to aid his/her own memory. Slip op. at 26. We concluded in that case that there were sufficient instructions by the court as to the use of the notes and no prejudice was shown to the defendant.
Today, we hold that juror note-taking is left to the sound discretion of the trial judge to permit it in cases where he/she deems it desirable or necessary in complicated matters or where both parties agree that jurors may take notes. We recommend that when jurors are allowed to take notes, the judge should give directions and set limitations on the use of the notes.

CONCLUSION
Finding no reversible error, we affirm the conviction and sentence of the trial court.
AFFIRMED.
*898 ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.