613 So.2d 1186 (1993)
Bennie Joel BURRELL
v.
STATE of Mississippi.
No. 90-KA-1091.
Supreme Court of Mississippi.
February 18, 1993.
*1187 C.E. Morgan, III, Morgan & Morgan, Kosciusko, for appellant.
Michael C. Moore, Atty. Gen., Pat S. Flynn, Asst. Atty. Gen., Jackson, for appellee.
Before PRATHER, P.J., and PITTMAN and SMITH, JJ.
PITTMAN, Justice, for the Court:
This is a sad story of murder and assault. The defendant's wife was stabbed twenty-six times by her husband and is dead. The defendant's ten year old stepdaughter, who was stabbed seven times during the same episode, has been severely injured.
Bennie Joel Burrell, twenty-eight years of age, prosecutes an appeal from his convictions in the Circuit Court of Attala County of murder and aggravated assault. He was sentenced to serve consecutive sentences of life imprisonment and twenty years, respectively.
On appeal, Burrell raises issues dealing with: (1) the denial of his motion(s) for a change of venue; (2) the weight of the evidence; and (3) the refusal to allow Glenda Wedge to testify on behalf of the defendant as a witness in surrebuttal inasmuch as she had not been sequestered during the trial. After meticulous scrutiny of these issues arising out of a brutal homicide and assault, we affirm.

FACTS
Bennie Joel Burrell and Lori Jean Burrell were husband and wife. In March of 1990, they were living in Kosciusko, Attala County, Mississippi, at the Cannonade Apartments with Jimmy Joel Burrell, their four year old natural child, and Katie Suzanne Sutton, the defendant's ten year old stepdaughter and Lori's natural child from another man.
The six year marriage had been a turbulent one with numerous separations and reconciliations. Bennie had been staying with his parents in the McAdams Community, but on March 9th he and Lori were living together in the marital residence, apartment 9-C of the Cannonade Apartments.
Testimony established that on the night of March 9, 1990, Bennie left the apartment at 7:30 p.m. and went to the Speedway Inn, a local nightspot, to shoot some pool. Katie testified that shortly after 9:00 p.m. her mother, who was upset and crying, telephoned the club and told Bennie if he could not be home in fifteen minutes or less he should not come home at all.
Bennie's testimony was to the effect that he left the nightclub at approximately 1:00 a.m. the early morning of the 10th and *1188 drove to the Cannonade Apartments where he observed that the lights were off in Lori's apartment. He then drove to his parents' home in the McAdams Community located approximately eight miles from the marital domicile. According to Bennie, he arrived at his father's house at approximately 1:30 a.m. where he went to bed around 2:00 a.m. after watching television for several minutes. Both Bennie and his parents claimed Bennie was asleep until he was awakened by police officers around 5:00 a.m. the morning of March 10th.
Katie Sutton's testimony was entirely different; she testified that at 3:30 a.m. she got out of bed after hearing somebody knock on the apartment door. Lori went to the door and cracked it open while keeping the security chain latched. Katie, who was in her bedroom, overheard her mother say, "Bennie, please leave." Bennie did not leave; rather, he broke through the door and entered the apartment.
Katie ran to the end of the hallway where she observed Bennie and Lori Burrell fighting one another. Katie did not see a knife, but she saw Bennie punching Lori below her uplifted arms with one of his hands while holding Lori's neck with the other. Although the light in the room was not on, Katie could see the incident clearly by the light shining through the window. During the struggle, Lori instructed Katie to go get the gun. Katie promptly retrieved a "long" gun from a bedroom closet. She pointed the gun at her stepfather who was still punching Lori, but did not pull the trigger for fear of hitting her mother. Responding to Lori's frantic request, Katie then dialed 911 on the telephone but got a busy signal. Lori managed to elude her assailant momentarily and ran out the front door to summon assistance. Bennie then turned his attention toward Katie who had curled up in a chair near the telephone. Katie had her legs next to her chest, her head down, and her arms wrapped around her knees when her stepfather began to stab her after telling Katie, "You are going to pay." Katie testified she was stabbed seven times, twice in her shoulder and once each in the wrist, cheek, lung, hand, and stomach. During the time she was being stabbed, Katie could hear her mother screaming for help.
After stabbing Katie, Burrell left the apartment in pursuit of Lori. Katie went into the bathroom where she used a towel to stop some of the bleeding. Bennie came back into the apartment, grabbed Katie around the throat with one hand, pulled her into a hallway, and began to strangle her. Katie could see her stepfather's face when he entered the bathroom. Katie testified that when they got into the hallway, "[h]e got down on his knees and strangled me with both hands as tight as he could." Katie testified: "After he was finished, I guess he thought I was dead, and I was for a second until he threw me up against the wall and my heart started beating again."
After Bennie left the apartment for the second and final time, Katie, who could still hear her mother screaming, again dialed 911 and again got a busy signal. She then dialed the operator, and "I told her where I was, and I told her that I needed the police and everything, and then I had a black-out, and while I was talking to the operator I heard my mom's last scream." Katie was hospitalized for six weeks at the Baptist Medical Center in Jackson where she had a partial colostomy.
Marnita Lynn Walker, a resident of apartment 13-B of the Cannonade Apartments, testified she was awakened about 3:15 a.m. on March 10th by a telephone call. After hearing a cry for help, she looked out her window where, under well-lighted conditions, she saw a man she identified in court as Bennie Burrell beating, kicking, and stomping with his hands and feet a lady who was lying on the ground. After beating and stomping her relentlessly, Burrell ran back up the stairs, only to return a short time later where he crouched over his victim's bruised and bloodied body. A police cruiser arrived at this time, and the defendant fled. Law enforcement officials found Lori dead and Katie severely injured, both as a result of multiple stab wounds.
Bennie Burrell testified in his own behalf and asserted an alibi in defense of the *1189 charges. His alibi was corroborated, at least in part, by both his mother, Katherine Burrell, and his father, Dave Burrell. Each testified that Bennie had been asleep at his parents' home in McAdams at 3:00 a.m. the morning of the 10th and that he slept until the police came to arrest him at 5:00 a.m. Dave Burrell testified his son was never awakened and never left the house between 1:30 and 5:00 a.m.
According to the testimony of Dave and Katherine, they neither aroused nor disturbed Bennie after they received a telephone call from the police notifying them of the stabbing at the Cannonade Apartments and requesting that someone come and get Bennie's five year old son. Nor did they awaken the defendant when a telephone call was received from the local hospital informing the family that Bennie's wife had died and Katie was being transported to a hospital in Jackson in critical condition. Bennie's parents claimed they let Bennie sleep during this crisis because he had to get up and go to work the next day and needed his sleep.
When asked about the condition of his son's clothing, Mr. Burrell claimed there was no blood on either the clothing or the person of his son. This testimony was corroborated by the testimony of Bennie's mother.

ISSUES

1. Change of Venue
A month prior to trial Burrell filed a motion for a change of venue alleging he could not get a fair and impartial trial in Attala County because: (1) numerous articles concerning the crime had appeared in the local newspaper in the weeks immediately succeeding the incident; (2) there had been radio coverage of the crimes; (3) the media coverage was unusual and more extensive than coverage for other similar offenses; and (4) a majority of people in Attala County had prejudged the case and indicated ill will toward the defendant. The trial judge, in the wake of conflicting testimony, overruled the motion for a change of venue following a lengthy hearing separately conducted on September 10, 1990.
During the hearing, twelve witnesses representing a fair cross-section of the community and each with longstanding and close ties to Attala County testified for the State. Eleven of these witnesses testified outright they believed the defendant could get a fair and impartial trial in Attala County. Five of these witnesses testified they had heard no one express any hostility or ill will toward the defendant; two witnesses testified they did not believe the people of Attala County had become "inflamed" against Mr. Burrell. Four witnesses testified they felt there had been no prejudgment of the defendant's guilt; and at least one witness testified there had been other crimes in the county which were the focal point of more outrage than the present one.
Ten witnesses testified for the defendant. Six of those witnesses testified outright they did not believe the defendant could receive a fair trial in Attala County. Weatherly, the editor of the weekly newspaper published in the county, testified that community interest had been less than expected considering the nature of the crime. He further testified he did not have enough information to give a good answer to the question of whether or not Burrell could receive a fair trial in Attala County. Coleman, one of the police investigators in the case, testified that based upon what he had heard in Attala County he did not see any reason why the defendant could not get a fair trial in Attala County. Of the ten witnesses produced by the defendant, three of them were close friends of the defendant's parents and two witnesses were related to the accused.
None of the circumstances which would justify a change of venue as a matter of law are present in this case. See Weeks v. State, 493 So.2d 1280, 1286 (Miss. 1986). This is not a death penalty case, and the defendant's life was not at stake; there was no evidence of crowds threatening violence; the media coverage was not extensive, consisting entirely of four articles in the county newspaper appearing on March *1190 15th, March 29th, July 19th, and July 25th; although this was a serious and brutal offense, there was no evidence it was committed against a prominent or influential family; and this was a white on white crime and defense counsel was not inexperienced.
In our opinion, the State successfully rebutted any presumption that adverse sentiment was such that Burrell could not receive a fair and impartial trial in Attala County.
Burrell renewed his motion on October 1, 1990, the day of trial during and following voir dire. He argued that sixty of the sixty-two venirepersons summoned for duty admitted they had heard something about the case. Approximately one fourth of the venire was struck for cause. None of the twelve jurors finally selected indicated, however, they could not be fair and impartial regardless of what they had heard or read.
"On the issue of venue change, this Court will not disturb the ruling of the lower court where the sound discretion of the trial judge in denying change of venue was not abused." Harris v. State, 537 So.2d 1325, 1328 (Miss. 1989). See also Box v. State, 610 So.2d 1148 (Miss. 1992) and the cases cited therein. No abuse of sound, judicial discretion has been demonstrated here.
The record fully supports the factual findings made by the trial judge that media coverage of the charges lodged against Burrell was not widespread and did not reach epidemic proportions. The facts found in this case are not comparable to the facts on the venue question found in the capital cases of Fisher v. State, 481 So.2d 203 (Miss. 1985), and Johnson v. State, 476 So.2d 1195 (Miss. 1985). Where, as here, the evidence is conflicting on the question of whether or not the defendant could receive a fair and impartial trial, this Court will generally defer to the considered opinion of the trial judge. Here the lower court carefully evaluated and weighed the evidence produced during the motion hearing, considered the lack of extensive media publicity, and heard the assurances of the venirepersons that they would base their decision on the evidence heard in court and not upon extraneous factors. Therefore, we uphold the integrity of the trial court's decision denying a change of venue.

2. Motion for New Trial/Weight of Evidence
Burrell claims the verdict of the jury was against the overwhelming weight of the evidence and a product of bias, passion, and prejudice. He suggests the ear and eyewitness testimony elicited from Katie Sutton, who was stabbed seven times and strangled by her assailant, and from Marnita Lynn Walker, who observed portions of the assault from the window of her ground floor apartment, was not credible. Put another way, the defendant's claim of "bias, passion or prejudice" rests solely on the fact the jury chose to disbelieve the defendant's alibi which was corroborated by his parents.
First, jury instruction C-1 told the jury in plain English that it "should not be influenced by bias, sympathy or prejudice[; rather, y]our verdict should be based on the evidence and not upon speculation, guesswork or conjecture." This Court has consistently held that when a trial court instructs the jury, it is presumed the jurors follow its direction. Crenshaw v. State, 520 So.2d 131 (Miss. 1988); McFee v. State, 511 So.2d 130 (Miss. 1987); Johnson v. State, 475 So.2d 1136 (Miss. 1985). Second, both Katie Sutton and Marnita Walker made positive and unequivocal in-court identifications of Burrell as the early morning assailant. The defendant, on the other hand, asserted an alibi defense which was corroborated by his parents. Obviously, a material testimonial conflict is present.
Our system of jurisprudence has a method of resolving such conflicts. We leave to the jury the task of determining the facts from the evidence and applying the law to those facts. Thus, the posture of Burrell's evidentiary complaint can be summarized in only three words, namely: "classic jury issue."
*1191 In Maiben v. State, 405 So.2d 87, 88 (Miss. 1981), this Court announced that "we will not set aside a guilty verdict, absent other error, unless it is clearly a result of prejudice, bias or fraud, or is manifestly against the weight of credible evidence." Id. (emphasis added).
The following observations made in Groseclose v. State, 440 So.2d 297, 300 (Miss. 1983), are also worth repeating here:
We will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice. Pearson v. State, 428 So.2d 1361, 1364 (Miss. 1983). Any less stringent rule would denigrate the constitutional power and responsibility of the jury in our criminal justice system. (emphasis added)
See also Benson v. State, 551 So.2d 188 (Miss. 1989); Wash v. State, 521 So.2d 890 (Miss. 1988); Jackson v. State, 551 So.2d 132, 148 (Miss. 1989) ["The Circuit Court should not order a new trial unless it is convinced that the verdict is so contrary to the weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice."]
Katie Sutton saw as well as heard the brutal events of the evening. She testified that after her mother cracked open the door she heard her mother say, "Bennie, please leave." In addition to this, Katie, for what must have seemed an eternity, had a full and unobstructed view of her stepfather as he stabbed her mother repeatedly and then stabbed her.
In addition to the two eyewitness identifications, Burrell's fingerprint was found on a bloody telephone inside the living room of Lori's apartment, and two witnesses had recently observed the defendant with a knife. Although both of the elder Burrells testified that Bennie did not own a single edge, lock-blade knife similar to the murder weapon, Sam Burnley testified he had sold the defendant such a knife in December of 1989. Ben Stahl and Peggy Burnley, who worked with Bennie Burrell at Ben Stahl's place of business in the McAdams Community, testified they had seen Bennie with a similar but, according to Stahl, a smaller knife. Peggy Burnley's observation was made the day before the murder when she saw Burrell using a whetstone to sharpen the knife.
Finally, it is well settled the jury is under no obligation to accept an alibi defense asserted by the accused and his witnesses. Lee v. State, 457 So.2d 920 (Miss. 1984); Ruffin v. State, 447 So.2d 113 (Miss. 1984). Rather, an alibi simply raises an issue of fact to be resolved by the jury. Gray v. State, 549 So.2d 1316 (Miss. 1989). "It is elemental that the State does not have to prove an alibi to be untrue." Forrest v. State, 352 So.2d 1328, 1330 (Miss. 1977). Its burden is simply to prove beyond a reasonable doubt that the accused was present at the time and place testified about and that he murdered and assaulted the victims. Id. The jury, we note, was generously instructed via instruction D-3 with respect to Burrell's alibi defense.
The case of Gray, 549 So.2d 1316, 1319, involved a scenario where the defendant's parents presented alibi testimony. We stated:
Secondly, Gray contends that his alibi testimony by his parents is fatal to the state's case. This argument misses the mark. An alibi defense simply raises an issue of fact to be resolved by the jurors, who are under no obligation to accept the defense. Lee v. State, 457 So.2d 920, 924 (Miss. 1984) (citing Tubbs v. State, 402 So.2d 830, 834-835 [Miss. 1981]).
See also Goss v. State, 413 So.2d 1033, 1036 (Miss. 1982) (Jury verdict was not against weight of evidence even though the defendant's alibi was corroborated by his mother and his sister.)
The Burrells testified their son slept through several telephone calls notifying the family of these horrible events. The senior Burrells claimed that the reason they did not awaken Bennie after learning that his wife had been murdered and his stepdaughter seriously injured was because Bennie "had to go to work the next morning." The power of persuasion on this point is questionable at best.
*1192 In deciding who to believe, the jury was certainly entitled to take into consideration the motives and interests of the testifying witnesses. It is enough to say that the jury, and not the reviewing court, judges the credibility of the witnesses as well as the weight and worth of their conflicting testimony. Gathright v. State, 380 So.2d 1276 (Miss. 1980). "The jury is the sole judge of the weight and credibility of the evidence." Byrd v. State, 522 So.2d 756, 760 (Miss. 1988) (emphasis added).
Affirmation of this case will not sanction an unconscionable injustice nor can it be said the jury's verdict was a product of prejudice, bias, or fraud. The physical evidence, as well as the eyewitness identifications, supports Burrell's convictions of murder and aggravated assault. Accordingly, the denial of Burrell's motion for a new trial was hardly an abuse of judicial discretion.

3. The Defendant's Surrebuttal
At the beginning of trial, the witness sequestration rule was invoked. Burrell contends the trial judge erred in refusing to permit Glenda Wedge, his sister, to testify as a surrebuttal witness after she had been sitting in the courtroom during the entire trial listening to the testimony of the other witnesses, including the defendant and his parents.
The testimony of Mrs. Wedge was the subject of a proffer. We have examined her proffered testimony with great care and conclude her testimony was merely cumulative of the testimony elicited from the defendant's parents, Dave and Katherine Burrell, during the defendant's case-in-chief. Accordingly, we hold the trial judge did not abuse his judicial discretion in refusing to let Glenda Wedge testify as a surrebuttal witness. Goss v. State, supra, 413 So.2d 1033, 1035 (Miss. 1982); Ford v. State, 227 So.2d 454, 457 (Miss. 1969); Smith v. State, 144 Miss. 437, 110 So. 119 (1926).
The witness sequestration rule is embodied in Miss.R.Evid. 615 (1986). The purpose of the rule is to discourage falsification, inaccuracy, and collusion. Moffett v. State, 540 So.2d 1313 (Miss. 1989). The sequestration of witnesses is a matter of right except for the three categories of people identified in Rule 615. Douglas v. State, 525 So.2d 1312, 1316 (Miss. 1988). None of these exceptions apply in this case.
Here the testimony of Mrs. Wedge was merely cumulative to that already elicited from Burrell's parents. It would have added nothing to that which already had been made known. While there may be times when either the State or the defendant, in order to prevent manifest injustice, should be allowed to call to the witness stand an unsequestered witness, this case is not one of them.
Juries have traditionally decided issues of conflicting evidentiary fact. They have decided this case adversely to the defendant's alibi. We find both substantial and credible evidence in the record to support a finding that Burrell murdered his wife, Lori Burrell, and assaulted Katie Sutton, his stepdaughter. Accordingly, Burrell's convictions and consecutive sentences to life plus twenty years are affirmed.
COUNT I: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SAID SENTENCE TO RUN CONSECUTIVELY WITH SENTENCE IMPOSED IN COUNT I.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, BANKS, McRAE, ROBERTS and SMITH, JJ., concur.