# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 96-KA-00269-SCT

*DARREN LEE WHARTON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/07/95 |
| TRIAL JUDGE: | HON. JOHN H. WHITFIELD |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | TOM SUMRALL |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  BILLY L. GORE |
| DISTRICT ATTORNEY: | CONO CARANNA |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/25/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

**STATEMENT OF CASE AND FACTS**

¶**1.** Danny McCugh, a 45 year old convenience store worker, was shot four times with a twenty-five caliber pistol on the morning of July 17, 1994 during a robbery at the Circle K convenience store in Biloxi, Mississippi. McCugh died at the hospital several hours later. After allegedly receiving a confession from his son, Richard Wharton, father[1] of Darren Wharton, drove to New Orleans with Investigator Billy Emile of the Ocean Springs Police Department in order to assist in his son's peaceful arrest. Darren Wharton was in fact arrested in New Orleans and charged with the capital murder of McCugh and with the underlying crime of robbery.

¶2. At trial, the State's case included three separate confessions made by Wharton shortly after the murder. First, Priscilla George, a friend of Wharton's, testified that she had been playing a drinking game with Wharton and some other friends at her sister's house on the night of the murder. She testified that Wharton left the house that night and came back in a highly emotional state. George testified that:

A: And I picked up this little blanket and there was money there and a Circle K bag.

Q: Okay.

A. And then that's when he said that - - that's when he said he robbed the store.

Q: That's when who said that they robbed the store ?

A: Darren Wharton.

...

Q: Okay. At any point at time did the defendant say anything about having shot the clerk ?

A: Yes, sir.

Q: What did he say ?

A: He said that he think(s) he killed a man.

George admitted under cross-examination that she had been drinking a great deal that night, but she asserted that she clearly remembered Wharton's statements.

¶3. The second confession was allegedly made by Wharton to Michael Green, who was originally a co-defendant with Wharton, but who testified pursuant to an agreement with the prosecution. Green testified for the State that Wharton had tried to buy a gun from him prior to the robbery. Green testified that Wharton stated that he needed the gun to rob the store, and that, following the robbery, Wharton testified that he had shot the cashier.

¶4. The third confession was made by Darren to his father, Richard Wharton, who gave a tape-recorded statement to police in which he detailed the confession allegedly made by his son on the day of the murder. At trial, Richard Wharton denied any recollection of having made the statements in question, but the trial judge permitted the tape recorded statement to be played for the jury over the objection of the defense.

¶5. During the trial, the judge permitted the jurors to submit written questions to several witnesses and allowed jurors to take notes over the objection of both the prosecution and defense. Wharton was convicted of capital murder by the jury and was sentenced to life imprisonment following a capital murder sentencing trial. Aggrieved, Wharton appeals to this Court claiming the trial Court erred in admitting the taped statement of Richard Wharton, erred in allowing jurors to question witnesses, and erred in allowing jurors to take notes.

### I. WHETHER THE COURT ERRED IN ADMITTING INTO EVIDENCE A TAPED STATEMENT OF RICHARD WHARTON AFTER RICHARD STATED THAT HE DID NOT RECALL MAKING THE STATEMENT ON DIRECT EXAMINATION?

¶6. This Court, in *Wilkins v. State*, 603 So. 2d 309 (Miss. 1992), held that the State must be surprised by the testimony that the person was unable to recall the prior inconsistent statement in order for the prior inconsistent statement to be admissible.

¶7. Wharton argues that the State does not even attempt to assert that it was surprised by Richard's testimony, and the prosecutor acknowledged that prior to Richard's testimony that he claimed to have no

memory of his statement to police. Wharton ignores the very language of *Wilkins* as well as the language of the case law upon which it is based and, more importantly, the other facts of this record. In *Wilkins*, this Court wrote "it will be necessary that he show surprise **or unexpected hostility** . . ." *Id.* at 322. The language in *Wilkins* is disjunctive and also allows for **unexpected hostility**. Accordingly, under the plain language of *Wilkins*, the fact that the State may not necessarily claim surprise does not end the inquiry. Conversely, it must also be determined whether the State could show **unexpected hostility**, because only one week before trial Richard had assured the district attorney during two interviews that he recognized his own voice on the tape and he remembered what was said. Surely, based on that fact, the State had reason to believe that Richard would tell the truth during questioning at trial.

¶8. The record clearly reflects that it was the defense that objected to the line of questioning of Richard Wharton by the district attorney, on the basis that Wharton was previously shown a transcript of his prior statement and that now, while on the witness stand, Wharton apparently was not testifying to his own independent recollection. Whereupon the State promptly advised the trial judge that the State had "interviewed Richard on two occasions prior to today's trial, both occasions occurring last week." The State further stated, "In addition to having the opportunity to review that transcript, he was also given the opportunity to listen to that tape recording of his own voice. **He advised me at that time that he recognized his own voice, and he did, in fact, remember what was said.** " (Emphasis added). Thus, the State prior to trial, had legitimate reason to believe that Richard would in all likelihood testify truthfully. But, due to Richard's sudden lack of memory at trial, and contrary to what he had stated to the district attorney only one week prior, the district attorney announced to the trial judge, "The point is, Your Honor, that this is a hostile witness, and he may not want to remember." Therefore, this Court cannot under the facts of this record determine that Richard's testimony was **expected** hostility. Rather, the testimony was clearly unexpected.

¶9. Here, under the facts, the State clearly showed unexpected hostility. The record more than adequately so demonstrates. Before the prosecutor began questioning Wharton's mother and father, he announced that, "Judge, the next two witnesses are -- one is the defendant's mother, and the other is his father. **If they're not responding appropriately, I may have to have them as adverse witnesses, hostile witnesses**." (emphasis added). The record thus indicates that the State, relying upon Richard's statement made during two interviews one week prior to trial believed that both witnesses would tell the truth. Nevertheless, if they did not tell the truth the State maintained that upon such occurrence it would ask the Court to declare the witnesses hostile. In fact, Constance Wharton, who testified prior to Richard, apparently testified truthfully and no attempt was made by the State to claim surprise or hostility regarding her testimony. However, when Richard started answering questions, immediately he seemed to develop a lack of memory requiring the State to have him declared a hostile witness and to attempt to impeach him with his prior inconsistent statement.

¶10. The *Wilkins* holding is based upon this Court's decision in *Cooper v. State Farm Fire & Cas. Co.*, 568 So. 2d 687 (Miss. 1990), wherein this Court held that the admission of hearsay testimony to impeach a witness was in error. Specifically, this Court pointed out that

> [a]n extensive and careful reading of the record as a whole . . . shows that State Farm, **knowing all the while what the responses would be,** offered the testimony of Susie Arnett for no other reason than to impeach her denials with the hearsay testimony of McClain, Brown and Lomenick [the insurance company representatives].

***Wilkins***, 603 So. 2d at 322 (*quoting **Cooper***, 568 So. 2d at 691).

¶11. In ***Cooper***, State Farm clearly knew in advance that the witness was going to deny certain statements thus it laid the trap for her. The case at bar is clearly distinguishable from ***Cooper*** since the prosecution unquestionably indicated that it **may** have to declare either or both Constance and Richard as adverse witnesses, depending upon whether they responded truthfully and appropriately. Here, the fact that the mother testified first and truthfully answered questions posed by the prosecution provides further support for the position that the State expected Richard to testify truthfully, but did not know with one-hundred percent certainty how Richard would testify once he was on the witness stand under oath. But, at any rate the State expected that he would tell the truth based on two prior admissions. Consequently, the State can and certainly did show unexpected hostility. Accordingly, under the facts of the case at bar, the taped confession was admissible as impeachment testimony under Rule 607 and in accordance with this Court's prior holdings. That is all that was required of the State in order to impeach Richard Wharton. There is no merit to this issue.

### II. WHETHER THE LOWER COURT ERRED IN ALLOWING THE JURY TO SUBMIT QUESTIONS TO WITNESSES?

¶12. Over the objection of both the State and defense, the trial judge permitted the jury to submit written questions for his approval to be read to witnesses. Wharton argues that the trial judge denied Wharton the right to an impartial jury by permitting the jury to submit questions to the witnesses.

¶13. The trial judge should not have allowed the jury to ask questions of the witnesses, especially since both the State and defense objected to the procedure. However, here, the questions that were posed and the answers given were extremely unlikely to have influenced the jury's verdict. Therefore, the procedure although improper, was harmless beyond a reasonable doubt. Specifically, Wharton argues that:

> In allowing the jury to present questions to the witnesses, the trial court redefined their role and transformed them from "fair and impartial" to active participants in the trial. By doing so, the trial court also relieved the State of its burden of proof. The jury, by asking questions, was allowed to elicit evidence from the witnesses - - the State did not have to do its job and meet its burden. When the State failed to elicit the evidence from a particular witness the jury was allowed to pick up the slack.

In electing to permit the questioning of witnesses by the jurors, the trial judge stated that he was unaware of any cases set forth by this court which either permitted or forbade questioning by jurors.

¶14. Wharton notes, however, that this Court has in fact addressed this issue in the past. On the rare occasion that this issue has arisen, this Court has expressed varying degrees of reservations with regard to the practice of juror interrogation of witnesses. This Court has held the matter to lie within the discretion of the trial judge in at least one opinion. In ***Lucas v. State***, 381 So.2d 140, 144 (Miss. 1980), this Court held that:

> This Court does not approve the practice of a trial court inviting jurors to ask questions of witnesses. This privilege should only be granted when, in the sound discretion of the trial judge, it appears that it will aid a juror in understanding some material issue involved in the case and then, ordinarily, when some juror has indicated that he wishes such a point clarified. Here, the defense counsel invited the jury to ask questions when no juror had voiced a need for clarification of any issue or testimony. It

was improper for the defense attorney to request the jurors to ask questions of the witness, and the trial judge was correct in sustaining the objection.

*Lucas*, 381 So.2d at 144-45. This Court thus held in *Lucas* that the juror questioning of witnesses is within the "sound discretion of the trial judge" when it appeared that the juror wanted a point clarified and that the primary consideration should be whether the information will "aid a juror in understanding some material issue involved in the case." *Id.* at 144.

¶15. In a more recent case, however, this Court wrote more strongly in disfavor of the practice of juror interrogation of witnesses. This Court held in *Myers v. State*, 522 So.2d 760 (Miss. 1988) that:

> We note some courts allow juror interrogation in the trial court's discretion. We are of the view, however, that this is a practice that should be discouraged. In the event a juror does blurt out a question, the trial judge should step in without waiting for an objection and seek to prevent any prejudice befalling the defendant. Where, as here, that opportunity passed by, we must review whether the juror's conduct so prejudiced the defendant that a new trial is warranted.

*Myers*, 522 So.2d at 762 (citations omitted.). This Court in *Myers* did not mention the earlier decision in *Lucas*, and *Lucas* has not been overruled. Moreover, this Court in *Myers* did not forbid outright the interrogation of witnesses by jurors, but merely "discouraged" such questioning. This Court in *Myers* did make a limited holding applicable to cases in which a juror "blurts out" a question, but the present case involves a preliminary deliberate decision by a trial judge to have written questions submitted by jurors and read to witnesses within his discretion. *Myers* is thus less applicable to the facts of the present case than *Lucas*, and the "blurting out"of questions by jurors clearly carries a higher likelihood of unfairly prejudicing a defendant than the practice implemented by the trial judge in the present case.

¶16. Although this Court has not written approvingly of the practice of juror interrogation of witnesses, the practice implemented by the judge in the present case is, in many respects, less objectionable than the practices which this Court considered in both *Myers* and *Lucas*. The record indicates that, in total, twelve questions were submitted to the trial judge for his scrutiny, but the judge permitted only six questions to be read to the witnesses. The trial judge thus rejected half of the questions submitted by the jurors for his consideration, and it is thus apparent that the present case did not involve the direct and unfettered questioning of witnesses by the jurors.

¶17. A review of nationwide authority on this issue indicates that the view expressed by this Court in *Lucas* constitutes, by far, the majority view on this issue. In *Commonwealth v. Urena*, 632 N.E.2d 1200 (Mass. 1994), the Supreme Court of Massachusetts cited *Lucas* in noting the "decisions by the great majority of the courts of other States that, in general, permit juror questioning of witnesses . . . in the sound discretion of the judge." *Urena*, 632 N.E.2d at 1203. It is thus apparent that the Massachusetts court interpreted the law of this State as permitting juror interrogations within the discretion of the trial judge[(2)].

¶18. The record reveals that the questions which were submitted to the witnesses all concerned factual matters relating to the evidence. Patrolman Johnson, a witness for the State, answered "no" when questioned as to whether he had asked either of the two black girls in the store if they had made a 911 call. Michael Green, a witness for the State, answered "no" when asked if he had purchased a particular type of shell for his .25 automatic. He also answered in the negative when questioned whether the store in which the murder occurred was the one he patronized for purchasing beer. Priscilla George, a witness for the State,

answered in the affirmative when questioned whether Randy (Ricky) and Shane Caldwell were brothers. She also responded to a question regarding the age of the brothers by stating "I think Ricky is 22 and Shane is 20."

¶19. The aforementioned questions are all of a highly innocuous nature, and it is extremely unlikely that the answers to these questions influenced the jury's verdict in any respect. The only question which might be argued to have conceivably played any role whatsoever in the jury's verdict was a question posed to Randall Ludwig regarding the race of a person who he saw running from the store on the night of the murder. Randall Ludwig testified for the defense that the man who he saw running from the store that night was not present in the courtroom, and the defense sought to use this testimony to argue that someone other than Wharton robbed the store on the night in question. The State did not inquire during cross-examination, however, whether the man who Ludwig saw running from the store was black or white. We do not see where this question influenced the jury or its' verdict.

¶20. A trial is in large part a search for the truth. Our adversary system, through the well defined roles of its participants, is also designed to protect individual rights of defendants. "Due process and those individual rights that are fundamental to our quality of life co-exist with, and at times override, the truth-finding function." *See* ***Morrison v. State***, 845 S.W.2d 882, 884-845 (Tex. Crim. App.1992) (creating an absolute bar to juror questioning of witnesses).

¶21. The most obvious problem with allowing jurors to question witnesses is the unfamiliarity of jurors with the rules of evidence. "Our system is an adversary one which depends upon counsel to put before lay fact finders that which should be admitted in accordance with the rules of evidence and to keep from them that which should not be received in evidence." ***State v. Hays***, 883 P.2d 1093, 1099-1100 (Kan. 1994) (*quoting* ***State v. Zima***, 478 N. W. 2d. 377 (Neb. 1997)). Other potential problems include (1) Counsel may be forced to either make an objection to a question in front of the juror who asks the question, at the risk of offending the juror, or withhold the objection and permit prejudicial testimony to come in without objection; (2) juror objectivity and impartiality may be lessened or lost; (3) if a juror submits a question in open court, the other jurors are informed as to what the questioning juror is thinking, which may begin the deliberation process before the evidence is concluded and before final instructions from the court; (4) if the juror is permitted to question the witness directly, the interaction may create tension or antagonism in the juror; and (5) the procedure may disrupt courtroom decorum. ***Hays***, 883 P.2d at 1099.

¶22. Our prior warnings concerning juror questioning have apparently gone unheeded on occasion. Today we hold that juror interrogation is no longer to be left to the discretion of the trial court, but rather is a practice that is condemned and outright forbidden by this Court. To that extent, both ***Lucas*** and ***Myers*** are overruled. Although we hold the procedure to be reversible error, here we find same to be harmless for the previous reasons set forth.

### III. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE JURY TO TAKE NOTES DURING THE TRIAL?

¶23. Wharton argues that the trial court committed reversible error in permitting the jurors to take notes over the objection of both parties. However, in ***Wash v. State***, 521 So. 2d 890, 897 (Miss. 1988), this Court held that:

Today, we hold that juror note-taking is left to the sound discretion of the trial judge to permit it in

cases where he/she deems it desirable or necessary in complicated matters or where both parties agree that jurors may take notes.

We allow juror note taking at the discretion of the trial judge subject to some restrictions. However, a significant danger of prejudice exists if jurors are allowed to use in deliberations notes taken during trial. Juror notes may give undue weight to that portion of the evidence covered by a juror's notes at the expense of evidence on which no notes were taken. The notes should not be read or used by any juror other than the juror who took the notes. *See Wash v. State*, 521 So. 2d 890, 897 (Miss. 1988) (*citing Nixon v. State*, 533 So. 2d 1078 (Miss. 1987)). We therefore hold that juror notes are permissible, but should not be allowed to be taken by that juror into the jury room during deliberations. To that extent, *Wash* and *Nixon* are overruled. There is no merit to this issue.

## CONCLUSION

¶24. Richard Wharton's prior statement was admissible under Rule 607 in accordance with this Court's prior holdings. The State showed unexpected hostility and that was all that was required in order to impeach Richard. Juror questioning of witnesses is prohibited. Juror note taking during trial is allowed, however, jurors are prohibited from taking those notes into the jury room during deliberations.

¶25. **CONVICTION OF CAPITAL MURDER AND LIFE SENTENCE WITHOUT POSSIBILITY OF PAROLE IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**PITTMAN, P.J., ROBERTS AND WALLER, JJ., CONCUR. SULLIVAN, P.J., CONCURS IN PART. PRATHER, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS AND McRAE, JJ. SULLIVAN, P.J., JOINS IN PART. MILLS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY McRAE, J.**

**PRATHER, CHIEF JUSTICE, DISSENTING**:

¶26. I respectfully dissent. I disagree with the majority's conclusion that Richard Wharton's statement to police is admissible as impeachment evidence. This Court set forth the law with regard to the introduction of prior inconsistent statements for the purposes of impeaching a party's own witnesses in *Wilkins v. State*, 603 So.2d 309 (Miss. 1992). This Court wrote in *Wilkins* that:

> To remove any doubt as to the meaning of Rule 607, we hold today that in its application, just as in our pre-rules decisions, before a party will be authorized to introduce for impeachment purposes an unsworn pretrial inconsistent statement of his own witness, it will be necessary that he show surprise or unexpected hostility, and that such statement can never be used as substantive evidence. We also

hold that under the "unfair prejudice, confusion of the issues, or misleading of the jury" provisions of Rule 403, the circuit judge should consider whether a cautionary instruction to the jury will be sufficient to keep the jury from treating the unsworn pretrial inconsistent statement as substantive evidence, and if not, the statement should not be introduced.

*Wilkins*, 603 So.2d at 322.

¶27. Thus, in order to impeach Richard with his prior inconsistent statements, the State must initially establish that 1) it was surprised by his testimony or 2) that Richard demonstrated "unexpected hostility." To hold otherwise, under the rationale of *Wilkins*, would permit the State to call Richard to the stand with full knowledge that he would deny having made or being able to recall the statements in question and then use this denial as a subterfuge for entering his hearsay statement.

¶28. The majority concludes that the record demonstrates "unexpected hostility" on the part of Richard, in spite of the fact that, prior to his testimony, the prosecutor stated that "(t)he point is, Your Honor, that this is a hostile witness, and he may not want to remember." It is difficult to conceive of more conclusive evidence that a witness' hostility was not unexpected than the prosecutor's statement to the trial judge, prior to the witness' testimony, that the witness was in fact hostile. The prosecution had interviewed Richard in the days leading up to the trial and learned of his professed inability to recall the information in question. The record clearly indicates that the prosecution was on notice that Richard would testify to a lack of memory, and it is further clear that the prosecution was seeking to use the "impeachment" of their own witness as a subterfuge for presenting Richard's hearsay statement to the jury. This is clearly improper under *Wilkins*.

¶29. If there were any remaining doubt in this regard, then this doubt is removed by the fact that, immediately prior to his testifying before the jury, Richard testified during a proffer that he had no recollection of having made the statements in question. The prosecution thus had Richard's sworn testimony that he could not recall having made the statements in question prior to eliciting this same testimony before the jury. Accordingly, the notion that the prosecution was somehow surprised either by Richard's testimony or by his hostility is plainly refuted by the record.

¶30. The trial court committed reversible error in admitting Richard's hearsay statement for "impeachment" purposes. In my view, a better course of action for the prosecution would have been to attempt to have Richard's statement admitted under the residual hearsay exception. See: Mississippi Rules of Evidence 804(a)(3) and 804(b)(5). However, the trial court failed to make any findings with regard to the 804(b)(5) factors, and case law is clear that this Court may not make these findings ourselves. See: *Quimby v. State*, 604 So.2d 741 (Miss. 1992); *Cummins v. State*, 515 So.2d 869 (Miss. 1987). Richard's sudden failure of memory does appear suspicious, and I can understand the majority's desire to hold the statement in question admissible. This Court must work within the framework of the Mississippi Rules of Evidence, however, and I see no basis for admitting the statement as impeachment evidence. In my view, this Court has no choice but to reverse and remand for a new trial.

¶31. With regard to the remaining points of error, I agree that the trial judge should not have permitted the juror questioning of witnesses in the present capital murder case over the objection of both parties. I do not join in the majority's blanket condemnation of the practice of juror questioning of witnesses, however. In my view, juror questioning of witnesses may have merit in at least some cases, and I would not go so far as to bar the process outright. If implemented properly, juror questioning of witnesses has the potential to assist the trier of fact in reaching an informed decision on the merits of the case. The process may raise some valid

concerns in the context of capital murder cases such as the present one but, in my view, the issue merits further study and consideration. I respectfully dissent.

**BANKS AND McRAE, JJ., JOIN THIS OPINION. SULLIVAN, P.J., JOINS IN PART.**


### MILLS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:


¶32. I respectfully dissent from the majority as to the issues of note taking and juror questioning. I concur with the majority regarding the admission of the taped statement of Richard Wharton.

¶33. The majority lists the following reasons why the Court should prohibit witness questioning by jurors:

1. Individual rights may be relegated to lesser importance than truth-seeking.

2. Jurors may be unfamiliar with the rules of evidence.

3. Jurors may be offended when a lawyer objects to their question.

4. Objectivity and impartiality may be lessened or lost.

5. Deliberation may begin before the trial ends if questions come in open court.

6. There may be tension between a witness and a juror if questions come in open court.

7. Decorum may be disrupted.

¶34. When the trial judge is given discretion to accept or reject juror questions, many of the concerns the majority lists disappear. As in the instant case, the judge should pose the questions, thus alleviating any tension between witnesses and jurors. While truth-seeking and individual rights must be balanced, we will come closer to a solution providing for both when the trial court has discretion to refuse or accept specific questions instead of being forced to impose a blanket ban. This balancing concern was the basis of our decision in *Lucas*, which the majority overrules today. We held, "This privilege should only be granted when, in the sound discretion of the trial judge, it appears that it will aid a juror in understanding some material issue involved in the case . . . ." *Lucas v. State*, 381 So. 2d 140, 144 (Miss. 1980). As the majority notes, most courts in this country have holdings similar to *Lucas*. The Fifth Circuit Court of Appeals has held:

> There is nothing improper about the practice of allowing occasional questions from jurors to be asked of witnesses. If a juror is unclear as to a point in the proof, it makes good common sense to allow a question to be asked about it. If nothing else, the question should alert trial counsel that a particular factual issue may need more extensive development. Trials exist to develop truth. It may sometimes be that counsel are so familiar with a case that they fail to see problems that would naturally bother a juror who is presented with the facts for the first time.

*United States v. Callahan*, 588 F. 2d 1078, 1086 (5th Cir. 1979). I agree and would decline to reject the reasoning of *Lucas* as the majority has done.

¶35. The issue of note-taking has been discussed for one hundred years or more in this country. *See United States v. Davis*, 103 F. 457, 470 (W.D. Tenn. 1900). I believe this matter should be left to the sound discretion of the trial court and does not warrant a staunch ban from this court.

¶36. Since the majority has chosen to disallow juror notes in deliberations, I also object to the majority's decision to overrule inconsistent portions of *Wash* and *Nixon*. In *Wash*, this court referred to *Nixon* and held: "In that case, the jurors were permitted to take notes and the trial judge and defense attorneys agreed upon a jury instruction which informed the jurors that the notes were to be used only by the juror who took them to aid his/her own memory." *Wash v. State*, 521 So. 2d 890, 897 (Miss. 1988)(citing *Nixon v. State*, 533 So. 2d 1078 (Miss. 1987)). I would not reject but instead would extend these cases to allow jurors to refer to their notes in deliberation. Why should a juror be allowed to take notes and then be denied the opportunity to use them in the jury room during deliberations? As stated previously, the debate over juror note-taking is long-lived and voluminous. However, the New York Eastern District Court in 1940 stated it succinctly:

> There is no legal reason why such notes should not be made by jurors. Judges and lawyers make notes, why not jurors? Certainly the making of notes would better aid their memories and thus enable them to more intelligently consider the evidence. While it did not happen in this case I see no objection to all jurors, if they desire, making notes which could be used by them to refresh their recollections, when we realize that the purpose of a law suit is to do justice rather than make it a game of chance.

*United States v. Carlisi*, 32 F.Supp. 479, 483 (E.D.N.Y. 1940). I would allow jurors, charged as responsible citizens, to do just as the New York court suggested.

¶37. Greater juror participation, whether through note-taking or the submission of questions, are tools which should not be easily discarded in a full search for truth.

**McRAE, J., JOINS THIS OPINION IN PART.**

1. Richard Wharton identified himself in court as Darren's father, but the briefs before this Court refer to Richard as his step-father.

2. The Massachusetts court noted that some state courts consider the submission of written questions to the judge to be the better practice, although other courts have permitted direct questioning. See, e.g *State v. Johnson*, 784 P.2d 1135, 1144-45 (Utah 1989) (permitting direct questioning).