**6/17/97**

IN THE COURT OF APPEALS

OF THE

STATE OF MISSISSIPPI

NO. 94-KA-00844 COA

CARLOS KEYS A/K/A CARLOS D. KEYS AND NICK WILLIAMS A/K/A NICK A. WILLIAMS

APPELLANTS

v.

STATE OF MISSISSIPPI

APPELLEE

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. R. I. PRITCHARD, III

COURT FROM WHICH APPEALED: PEARL RIVER COUNTY CIRCUIT COURT

ATTORNEYS FOR APPELLANTS:

ALBERT NECAISE FOR CARLOS KEYS A/K/A CARLOS D. KEYS

WILLIAM L. DUCKER FOR NICK WILLIAMS

ATTORNEY FOR APPELLEE:

OFFICE OF THE ATTORNEY GENERAL

BY: JOLENE M. LOWRYDISTRICT ATTORNEY: CLAIBORNE McDONALD, IV

MANYA S. CREEL

NATURE OF THE CASE: CRIMINAL -- FOUR COUNTS AGGRAVATED ASSAULT

TRIAL COURT DISPOSITION: GUILTY OF ALL FOUR COUNTS AND EACH DEFENDANT-SENTENCED TO SERVE FIFTEEN YEARS PER COUNT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, EACH SENTENCE TO RUN CONSECUTIVELY FOR TOTAL OF SIXTY YEARS

MANDATE ISSUED: 7/8/97

BEFORE THOMAS, P.J., COLEMAN, AND SOUTHWICK, JJ.

COLEMAN, J., FOR THE COURT:

A jury in the Circuit Court of Pearl River County found Carlos Keys and Nick Williams guilty of four counts of aggravated assault. The trial court sentenced both Keys and Williams to serve fifteen years in the custody of the Mississippi Department of Corrections for each count of aggravated assault with each sentence to run consecutively to, or begin after the completion of, the previous sentence for a total of sixty years to serve in the custody of the Mississippi Department of Corrections. Keys and Williams each have appealed from the trial court's orders of conviction of the four felonies of aggravated assault in which the trial court sentenced them as we have recited. This Court decides all issues which these Appellants have presented in their appeal adversely to them and affirms the trial court's respective orders of conviction of both Keys and Williams.

## I. FACTS

On February 3, 1992, Bobby Norfleet purchased a white 1986 Buick Regal from a couple in Picayune, Mississippi, for $1,000. After Norfleet had completed the purchase of this 1986 Buick Regal, he and Ricky McCormick were out riding in the car when they stopped at a store in Picayune. While they were inside the store, the Appellant, Carlos Keys, told Norfleet that he had wanted the same 1986 Buick Regal, but that Norfleet bought it before he, Keys, could get to the car's owners to buy it from them.

The next day, February 4, at approximately 9:30 a.m., Bobby Norfleet, Ricky McCormick, Bobbie Van Buren, and Norris Jackson were riding together in Norfleet's newly acquired Buick Regal. The four were traveling east on Weems Street en route to take Bobbie VanBuren to school when they approached the intersection of Weems and Davis Streets. This intersection is a four-way stop. Carlos Keys, Nick Williams, and an unidentified driver were traveling west on Weems Street, when both they and Norfleet stopped at the respective stop signs posted at this intersection. Keys and Williams got out of the car and walked toward Norfleet's Buick Regal

We recite the subsequent events harmoniously with the State's evidence because the jury found both Keys and Williams guilty. Keys approached Norfleet, the driver, at the driver's window. When Norfleet rolled down the driver's window to speak to Keys, whom he saw brandishing a handgun, Keys said to Norfleet, "Bitch, get out of the car!" Norfleet and some of the passengers in the car thought at first that Keys was kidding with Norfleet because of the previous day's conversation in the store between Norfleet and Keys, and they began laughing. Then some of Norfleet's passengers saw Williams approaching them from the passenger's side of the Buick Regal. They further noticed that as Williams approached the car, he was carrying a handgun and was also pulling a mask over his head. This was no joke!

Keys began to back away from the driver's side window while he repeated his command that Norfleet, McCormick, VanBuren, and Jackson get out of the car. Norfleet immediately feared that Keys and Williams would shoot his passengers and him so he pressed hard on the accelerator to leave

the scene of the encounter with Keys and Williams as quickly as possible. Keys and Williams opened fire on the fleeing car, which shattered its rear window and hit the body of the car with several bullets. In the barrage of gunfire, Norfleet ran the car into a ditch; and Norris Jackson, who had been riding in the front passenger seat, fell out of the vehicle when its passenger's door swung open. Jackson got up and began to run down the street while Keys and Williams continued shooting until Jackson finally jumped into a clump of trees for cover. Jackson was positive that Williams fired at him as he ran down the street and jumped into the clump of trees. Norfleet drove his car out of the ditch, and Keys and Williams got back into the vehicle in which they had approached the intersection of Weems and Davis and drove away. Keys' and Williams' fusillade injured neither Norfleet nor any of his passengers.

After the encounter with Keys and Williams, Norfleet drove to a nearby service station, where Bobbie Van Buren got out of the car. With his sole remaining passenger, Ricky McCormick, Norfleet then headed south down Highway 11 to the neighboring community of Nicholson. Norfleet and McCormick immediately left Nicholson and returned to the Picayune area, where they next encountered Curtis Broughton, an officer with the Picayune Police Department, whom that department's dispatcher had sent to investigate the shooting which begot the case *sub judice*. Broughton was about to detain Norfleet and McCormick when, instead, after they saw Broughton's patrol car, Norfleet and McCormick went to Broughton to report the shooting incident. L. M. Davis, an investigator with the Picayune Police Department was already at the scene of the shooting, and he came to take Norfleet and McCormick to the Picayune Criminal Justice Center to reduce their respective statements to writing.

All four of the occupants of Norfleet's vehicle had known Carlos Keys before the morning of February 4; thus, all four of them identified Keys by name as one of their assailants without resort to either a human or a photo lineup. Nick Williams, Keys' half-brother,Witnesses referred to Keys and Williams either as "half-brothers" or "step-brothers." was identified by name only by one of the victims, but the rest identified him through the use of a photo lineup at the Criminal Justice Center. Norris Jackson first identified a Chris Nixon by name as the other suspect, but some twelve weeks later at the photo lineup, he identified Williams as the other shooter. Jackson had been committed to the Oakley Training School after the shooting incident on a charge of possession of a firearm; hence the delay of twelve weeks before the Picayune police showed Jackson the photo lineup.

Warrants were issued for the arrest of Keys, Williams, and Nixon for the aggravated assault of Norfleet, Jackson, Van Buren, and McCormick. Keys was not arrested until Valentine's Day, 1994, when he ran from a 1983 Honda Civic in which he was riding when Picayune patrolman Isamel Quiroz stopped the vehicle because it had an expired license plate. Quiroz pursued Keys down the street by foot into a house. Quiroz entered the house, where he testified he found Keys standing in the bathtub with the shower curtain pulled forward in an attempt to escape officer Quiroz's determined pursuit. Williams had surrendered to the Picayune Police Department the afternoon of

February 4, the day the shooting occurred.

## II. TRIAL

On the 18th day of March, 1994, the grand jury in and for Pearl River County returned a four-count indictment against Keys, Williams, and Chris Nixon for the separate felonies of aggravated assault on Norfleet, Jackson, Van Buren, and McCormick; and their trial began on August 2, 1994. During the trial judge's initial voir dire of the venirepersons, an African-American female, Ms. Etta D. Bridges, told the judge that she had "been knowing them [Keys, Nixon, and Williams] since they were knee-high." The trial judge responded to Ms. Bridges' information by asking her, "From what you have heard and the fact that you have known all three Defendants, would that cause you any problem to where you would have preconceived ideas about the case? Knowing the three Defendants?" Ms. Bridges replied, "Yes, it would." The trial judge then inquired of Ms. Bridges, "So then do you think it would influence you to the extent that you could not decide the case just on the testimony, evidence, and instructions of law, that that would have an influence on you that you just couldn't put out of your mind and decide the case solely on the testimony, evidence, and instructions of law?" To this question, Ms. Bridges responded, "Yes, it would."

Another African-American female venireperson, Stella Roberts, responded to the trial judge's questions on voir dire that she had had Nicholas Williams in the class which she taught at Head Start and that she also knew Carlos Keys, whom she transported to and from Head Start. Ms. Roberts described one of these two defendants (her response was ambiguous about to which of the two she referred) as being "like my own kids." She then concluded that she didn't "believe [she] could be of good service to this trial." A third African-American female venireperson, Ms. Joyce J. Ford, advised the trial judge during his voir dire that she knew all three of the defendants and that one of the victims was her nephew. Enlightened by this information, the trial judge then questioned Ms. Ford as follows:

Q. Would that knowledge and the fact that you are related to one of the alleged victims, would that have an influence or bearing on you to where you could not decide the case just on the testimony, evidence, and instructions of law?

A. Probably so.

Q. Ma'am?

A. Yes, sir.

After both the State and each of the three Defendants had concluded their respective voir dire of the venirepersons, the trial judge recessed and excused the jury from the courtroom to await his further summons. In the jury's absence, at the judge's bench, and in the presence of counsel for the State and Keys, Nixon, and Williams, the trial judge excused venirepersons Bell, Ford, and Roberts for cause. Neither the State nor counsel for any of the three Defendants objected to the trial judge's excusing any of them for cause. The trial judge then took a brief recess, after which the State moved to nolle proseque the indictment as to the defendant, Chris Nixon, because, as the trial judge explained to counsel for Keys and Williams:

[T]he only witness the State of Mississippi had to identify Chris Nixon as participating in this situation is the juvenile who is now incarcerated in Oakley Training School [Norris Jackson]; and upon his being brought back [from Oakley Training School] to be a witness in this case informed the State that although he had named Chris Nixon at one point, when he observed the photo lineup he had identified Nick Williams from the photo lineup and that he didn't understand why Chris Nixon's

name continued on in the case. This being the only witness the State had to identify Chris Nixon as participating in this alleged event, the State has moved and the Court sustained the motion to nol-pros this case against Chris Nixon.

The State continued its prosecution of Keys and Williams on the four-count indictment for aggravated assault. The record contains the trial judge's statement that counsel for Keys and Williams had discussed the State's motion for nol-pros as to Nixon with their respective clients, and that both Keys and Williams agreed to continue. Indeed, the record contains the trial judge's direct questions to both Keys and Williams about whether they each wished to proceed, to which both of them replied affirmatively. The trial judge and counsel for the State, Keys, and Williams then proceeded to select twelve jurors and one alternate to try the case.

At approximately 12:45 p.m. the trial judge returned into the courtroom, announced the names of the thirteen jurors,The trial judge withheld the identity of the alternate from the panel of thirteen until just before the jury retired to deliberate, when he identified the alternate and excused her from the jury's deliberation. and excused the jury until 1:45 p.m. After the trial judge reconvened court following the noon recess, Williams' defense counsel moved for a mistrial "concerning the seating of this jury." We quote from the record his argument in support of this motion for a mistrial:

[A] motion was made by counsel in Chambers concerning the use of the Batson Rule, and prior to that this Court had already excluded, when the Defendant Chris Nixon was a member of the defense team, at that time one of the three persons accused and on trial, two black members were excluded from Jury No. 1, Etta D. Bridges and Stella M. Roberts. One of those ladies may have said that she knew everybody, but the other one particularly said that she was acquainted with the Chris Nixon family and knew Chris Nixon and was a friend of his mother's, or whatever. And we feel that by the State then coming forward and nol-prossing him and us having used the Batson Rule, that two black members were excluded that could have possibly been on this jury, and that we now have thirteen members, including the alternate, on the jury panel, with one black, with various members of the Black race being excluded because Chris Nixon was in the case at that time, then the Batson Rule used, and the Batson Rule did not allow us to consider, or we were not allowed to consider those persons who were excused for cause when Chris Nixon was still in the case.

The trial judge responded to Williams' motion for mistrial by observing that had Williams moved for a mistrial as soon as he sustained the State's motion to "nol-pros" Chris Nixon, rather than waiting until after the jury had been selected and empaneled, there remained the opportunity of rehabilitating Ms. Bridges and Ms. Roberts before the selection of the jury had begun. The trial judge further observed that if he granted Williams' motion for mistrial, the state of the court's docket would probably require that the case not be reset for trial until "maybe March of next year." For these two reasons, among others, the trial judge overruled Williams' motion for a mistrial "concerning the seating of the jury."

When the trial began, all four victims in Norfleet's vehicle testified that they saw Keys and/or Williams shoot at them as three of them sat in the rapidly accelerating car and as Jackson tumbled from the front seat through the opening door into the road-side ditch. Alibi was the defense which both Keys and Williams invoked. Keys' alibi was that he had spent the night before the shooting with his girlfriend, Roshundrala Price, in her apartment. The next morning between 9:30 and 9:40 a.m., his girlfriend, Roshundrala Price, drove Keys to his mother's house. Keys' mother testified she saw him at

that time, as did his mother's tenant, Sullivan Bell, who had come to Keys' mother's house to deliver some mail at approximately 9:45 a.m. Bell testified that he was accustomed to delivering Ms. Keys' and her husband's mail to her because he rented the house in which her husband had once lived. Her husband's mail continued to be delivered to where Bell lived; thus, he delivered it to Ms. Keys and her husband. Carlos Keys testified to establish his alibi defense.

Nick Williams' alibi was that he was at his grandmother's house when the shooting incident occurred; and both his grandmother's neighbor, Andrew Wilson, and Andrew Wilson's son, Brad Wilson, testified that they saw Williams at his grandmother's house.

As we noted earlier, the jury returned verdicts of "Guilty as charged." on all four counts of aggravated assault against both Keys and Williams. At a sentencing hearing held on August 12, 1994, the trial judge entered separate orders of conviction for both Keys and Williams in which he sentenced each of them to serve terms of fifteen years for each count of aggravated assault in the custody of the Mississippi Department of Corrections. The trial judge provided in each order of conviction that both Keys and Williams were to serve their four sentences of fifteen years per count of aggravated assault consecutively, the result of which was a total sentence of sixty years for both Keys and Williams. It is from these orders of conviction and the sentences imposed on them in these orders of conviction that both Keys and Williams have appealed.

### III. ISSUES

Keys and Williams filed separate briefs in this case. In their briefs each appellant included his individual statement of issues which Mississippi Rule of Appellate Procedure 28a(3) requires. Keys and Williams each propound four issues, of which two are similar in both briefs. The first similarity in issues is whether the jury's verdicts of guilt were against the overwhelming weight of the evidence; and the second similarity of issues is whether the trial judge's sentences of Keys and Williams were disproportionate to the four felonies of aggravated assault of which the jury found both of them guilty. We will first review, analyze, and resolve the two sets of two issues which may be addressed jointly because of their similarity and then the remaining four issues (two each for Keys and Williams) separately. We quote both sets of issues verbatim first from Key's brief and then from Williams' brief:

**A. Keys's Issues:**

1) Whether the verdict rendered in this cause was against the overwhelming weight of the evidence.

2) Whether remarks made by the prosecution during trial and closing argument concerning a similar case that was widely and recently publicized in this rural community appealed to the passions and prejudices of the jury, resulting in lack of a fair trial before an impartial jury.

3) Whether the Defendant's constitutional right to effective assistance of counsel was denied.

4) Whether the cumulative sentence is grossly disproportionate to the crime committed and therefore violative of the Eighth Amendment prohibition against cruel and unusual punishment contained in the United States Constitution.

**B. Williams's Issues:**

Proposition I:

That the court erred in overruling defendant's Motion for Mistrial following the state's nolle prosequi of co-defendant, Chris Nixon, and the court having already excused three (3) Black members of the jury panel, who were close friends of Chris Nixon's family after the *Batson* Rule was invoked.

Proposition II:

That as to count IV of the indictment, the verdict is against the overwhelming weight of the evidence. (Appellant is speaking to his conviction of aggravated assault on Norris Jackson.)

Proposition III:

That the court erred in harshly sentencing the defendant to sixty (60) years, which is not commensurate with a crime wh[ere] no one was injured.

Proposition IV:

That the multi-count indictment includes four (4) counts of aggravated assault which should have been considered as one event.

## IV. REVIEW, ANALYSIS, AND RESOLUTION OF THE ISSUES

### Keys Issue 1. and Williams Proposition II.

Keys' Issue 1:

Whether the verdict rendered in this cause was against the overwhelming weight of the evidence.

Keys argues "that the mere refusal to recognize such a strong alibi defense [as he presented] creates a presumption that the jury did not in fact consider all the testimony." He acknowledges that a jury is not under a duty to accept an alibi defense, but he also asserts that its members must consider all testimony in determining the guilt or innocence of the accused. He cites generally *Tubbs v. State*, 402 So. 2d 830 (Miss. 1981), to support the jury's duty to consider all the testimony in their determination of the accused's guilt or innocence. Thus, he contends that the trial court erred when it denied his motion for a new trial because no reasonable jury could have convicted him with the alibi defense he presented. Keys writes in his brief "that an unconscionable injustice resulted when the jury chose to ignore a substantial alibi defense, combined with the refusal to recognize the credibility problem created by the witnesses for the State via their inconsistent statements and testimony."

The Uniform Criminal Rules of Circuit Court Practice applied to the trial of this case. Rule 5.16 of the Uniform Criminal Rules of Circuit Court PracticeBy order of the Mississippi Supreme Court the Uniform Circuit and County Court Rules became effective on May 1, 1995. Rule 10.05 of the Uniform Rules of Circuit and County Court is practically identical to Rule 5.16 of the Uniform Criminal Rules of Circuit Court Practice. then provided:

The court on written notice of the defendant may grant a new trial on any of the following grounds:

. . . .

(2) If the verdict is contrary to law or the weight of the evidence.

UCRCCP 5.16. Rule 5.16 required Appellant Keys to preserve this issue by including it in his motion for new trial. In his motion for judgment notwithstanding the jury verdict and motion for new trial, Keys asserted "That the verdict of the jury is contrary to the law and to the weight of the evidence." By its order overruling motion for J.N.O.V. and motion for new trial rendered on August 12, 1994, the trial court denied Keys' motion for new trial. These preliminary observations are requisite to our recitation of the standard of review which the Mississippi Supreme Court has adopted for analyzing and reviewing the issue of whether a trial court errs when it denies a motion for a new trial. The supreme court's standard of review perforce becomes the appropriate standard of review for this Court. Finally, as the State correctly notes in its brief of appellee, Keys does not challenge the sufficiency of the evidence of his guilt of the four counts of aggravated assault.

Motions for a new trial challenge the weight of the evidence and "[implicate] the trial court's sound discretion." *McClain v. State,* 625 So. 2d 774, 781 (Miss. 1993). New trial decisions rest within the discretion of the trial court. *Id.* at 781. A new trial motion should only be granted when the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice. *Wetz v. State,* 503 So. 2d 803, 812 (Miss. 1987). This Court will reverse and order a new trial only upon its determination that the trial court abused its discretion when it denied the defendant's motion for new trial. *McClain*, 625 So. 2d at 781.

Keys called three witnesses to support his alibi defense. They were: (1) his mother, Terry Bumpers, (2) Sullivan Bell, who rented property from Ms. Bumpers, and (3) Jack Bogan, brother of Terry Bumpers and therefore Keys' uncle. All three testified that each saw or were with Keys either at the time of or shortly after the occurrence of the shooting. In addition to these three witnesses, Keys had also subpoenaed his girlfriend, Roshundrala Price, but for reasons which the record leaves opaque, Price was unavailable to testify notwithstanding Keys' attempt to subpoena her. Nevertheless, by stipulation of the State and Keys, the written statement which Roshundrala Price had given L. M. Davis, a plainclothes investigator with the Picayune Police Department, shortly after the incident was introduced into evidence as an exhibit. It is noteworthy that because of the State's stipulation that Ms. Price's statement could be introduced into evidence, the State's prosecutors were unable to cross-examine her about Keys' alibi.

In *Burrell v. State,* 613 So. 2d 1186, 1187 (Miss. 1993), Bennie Joe Burrell was convicted of the murder of his wife, who had been stabbed twenty six times, and of aggravated assault upon his ten-year-old step daughter, who had been stabbed seven times. Burrell's parents both testified that on the night of the crimes, their son was asleep in their home when these crimes occurred. *Id.* at 1189. His parents had received two telephone calls early that morning, the first of which was from the police department to notify them that their son's wife and stepdaughter had been stabbed and to request that someone come for Burrell's five-year-old son. *Id.* The second call was from the local hospital to advise them that Burrell's wife had died and that his stepdaughter was being transported by ambulance to a Jackson hospital in critical condition. *Id.* Nevertheless, Burrell's parents did not rouse

their sleeping son after either telephone call because, as they both explained in their testimony, their son needed his sleep so that he could get up and go to work the next morning. *Id*. The police arrested Burrell at his parents' home at 5:00 a.m. the same morning that the crimes occurred. *Id*.

On appeal, Burrell, like Keys in the case *sub judice*, argued that the jury's verdicts of his guilt of murder and aggravated assault were against the overwhelming weight of the evidence. According to the opinion in *Burrell*, Burrell rested his argument "solely on the fact the jury chose to disbelieve the defendant's alibi which was corroborated by his parents." *Id*. at 1190. The Mississippi Supreme Court rejected Burrell's argument. The Court opined:

Finally, it is well settled the jury is under no obligation to accept an alibi defense asserted by the accused and his witnesses. Rather, an alibi simply raises an issue of fact to be resolved by the jury. "It is elemental that the State does not have to prove an alibi to be untrue." *Forrest v. State*, 352 So.2d 1328, 1330 (Miss.1977). Its burden is simply to prove beyond a reasonable doubt that the accused was present at the time and place testified about and that he murdered and assaulted the victims. *Id*. . . .

*Id*. at 1191. *See also Goss v. State*, 413 So.2d 1033, 1036 (Miss.1982) (finding that jury verdict was not against weight of evidence even though the defendant's alibi was corroborated by his mother and his sister). In so far as Keys' alibi defense was concerned, it was nothing more than a "classic jury issue," (*See Burrell*, 613 So. 2d at 1190), and based on *Burrell*, we reject Keys' argument that the jury's verdict was against the overwhelming weight of evidence which his four alibi witnesses provided. We must respect the jury's resolution of the witnesses' credibility on the matter of where Keys was when the ambush of Norfleet and the three passengers in his car occurred.

Aside from the alibi aspect of Keys' first issue, Keys further emphasizes several discrepancies in the four victims' testimony about the color and kind of vehicle from which Keys and Williams emerged at the intersection of Weems and Davis Streets before they began firing at Norfleet's 1986 Buick Regal and about whether their assailants wore masks. Such discrepancies seem more relevant to the issue of whether the evidence of Keys' guilt was sufficient, an issue which Keys has not raised in his appeal. However that may be, in *Gandy v. State*, 373 So. 2d 1042, 1045 (Miss. 1979), the Mississippi Supreme Court explained the jury's duty to resolve such conflicts in the evidence in the following language:

As is usual in jury cases, the evidence conflicted, but the conflict does not necessarily create a "reasonable doubt" of appellant's guilt. Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject, the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into findings of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution.

Keys was the one suspect all four of the victims identified without any form of a lineup. All four of them already knew Keys, and the State's evidence further established that Keys had conversed the night before the incident at a store in Picayune with Norfleet and McCormick. As we related, the

subject of that conversation was Keys' displeasure with Norfleet's having purchased the Buick Regal which Keys had intended to buy. Norfleet, Jackson, Van Buren, and McCormick, identified Keys as one of the two men who shot at them on the morning of February 4, 1994, as they sped from the scene in Norfleet's Buick Regal.

We again cite *Burrell* for the proposition that "[t]he jury is the *sole judge* of the weight and credibility of the evidence." *Burrell,* 613 So. 2d at 1192 (citations omitted). "It is enough to say that the jury, *and not the reviewing court*, judges the credibility of the witnesses as well as the weight and worth of their conflicting testimony." *Id.* at 1192 (emphasis added).

We return to our standard of review to conclude our analysis of Keys' first issue and to resolve it adversely to Keys. Allowing the jury's four verdicts of Keys' guilt of aggravated assault to stand sanctions no unconscionable injustice. *See Wetz v. State,* 503 So. 2d 803, 812 (Miss. 1987). Therefore, because the trial court did not abuse its discretion when it denied the defendant's motion for new trial, we affirm the trial court's denial of Keys' motion for new trial and resolve Keys' first issue adversely to him.

Williams Proposition II.

That as to count IV of the indictment, the verdict is against the overwhelming weight of the evidence. (Appellant is speaking to his conviction of aggravated assault on Norris Jackson.)

Williams does not challenge the evidentiary basis for the jury's verdicts of his guilt of aggravated assault on Norfleet, McCormick, or Van Buren. Instead, he argues that the jury's verdict that he was guilty of aggravated assault on Norris Jackson, as count IV of the indictment charged, was against the overwhelming weight of the evidence.

Williams' brief contains the following argument on this issue:

[W]hen count IV is placed under the microscope for review, it fails. Reasonable men and women could not take Jackson's prior inconsistent statement [that Chris Nixon was one of his assailants], his testimony about the wearing of the mask and his revelation that he didn't even know Nick Williams and still convict beyond a reasonable doubt. Taken with the fact that three (3) credible witnesses testified for Nick Williams, the evidence presented against Williams would not justify a verdict to a preponderance of the evidence level, let alone beyond a reasonable doubt.

However, Williams conceded that he "knew he was facing an uphill battle when he assigned . . . the argument as against the overwhelming weight of the evidence."

Williams is correct that Norris Jackson testified that he had not known Nick Williams prior to the morning of the ambush at the intersection of Weems and Davis Streets. However, Norris testified as follows about the assault upon him after he fell from Norfleet's car as it sped away from the intersection:

When we pulled up to the stop sign, a gray, I think it was a Thunderbird, had pulled up. The Defendant Carlos Keys jumped out. I was playing with the radio, and Ricky [McCormick] said, "Man, they're running to the car with a gun." So I looked up and I saw Carlos at the window. Then he was saying, "Get out, get out . . . get out." I was laughing, and Ricky said, "Man I don't think

they're playing. We'd better get out." So as I was opening the door, Bob Norfleet had pulled off, and that's when I fell out of the car. And then after I stood up and looked around, I tried to run.

. . . .

I was running. And Nick Williams had started shooting at me. And I ran up the street and I jumped in the bushes, and he fired about two more shots, and then he ran to the car and got in the car and they pulled off.

The State then questioned Jackson about his earlier identification of Chris Nixon as the shooter. Again, we quote from the record:

Q. Norris, let me ask you this question: Initially did you tell the police or did you believe that the other individual with Carlos Keys was Chris Nixon?

A. Yes, sir.

Q. And what changed your mind about that or what happened to indicate to you that that was incorrect?

A. I thought it was Chris that was shooting at me, but I had pictured his face, and then when the police showed me the pictures in the lineup, I said, "That's him right there," and that was Nick Williams' picture; and I pointed him out, and that was Nick.

Q. The person's name that you--the name of the person whose picture you identified was Nick Williams; is that correct?

A. Yes, sir.

Q. Was that a picture of this Nick Williams that's here today in the courtroom?

A. Yes, sir.

Q. Is that the same person, the same person that shot at you out there on the street?

A. Yes, sir.

The prosecutor also inquired of Jackson about whether Williams was wearing a mask. Again we quote from the record:

Q. With respect to whether or not they had any masks or anything like that on, did they have anything like that on at any point when you first saw them?

A. When I first saw them?

Q. Yes.

A. No, sir.

Q. Later did they have a mask on?

A. Yes. I know Nick had on a mask for sure.

Norfleet, McCormick, and Van Buren all identified Williams as the second shooter from the six-photograph lineup which Investigator Jeff Wheat compiled and exhibited to these three victims. The State introduced this six-photograph lineup, composed of pictures of six young African American males, into evidence. Investigator Wheat testified without objection that "[a]ll four victims immediately -- positively identified Nick Williams as one of the shooters in the incident."

As for Williams' alibi, it, like Keys' alibi, created a classic jury issue, which the jury decided against Williams by rejecting the credibility of his three witnesses who testified in support of his alibi defense. *See Burrell*, 613 So. 2d at 1190. The standard of review on which we relied when we rejected Keys' arguments that the jury's four verdicts of "Guilty as charged." were against the overwhelming weight of the evidence require that we also reject Williams' argument that the one verdict of guilty of aggravated assault on Norris Jackson. Allowing the jury's verdict of Williams' guilt of aggravated assault on Norris Jackson to stand sanctions no unconscionable injustice. *See Wetz v. State,* 503 So. 2d 803, 812 (Miss. 1987). Therefore, because the trial court did not abuse its discretion when it denied the defendant's motion for new trial, we affirm the trial court's denial of Williams' motion for new trial and resolve Williams' second issue adversely to him.

**Keys' Issue 4**

Whether the cumulative sentence is grossly disproportionate to the crime committed and therefore violative of the Eighth Amendment prohibition against cruel and unusual punishment contained in the United States Constitution.

**Williams' Proposition III**

That the court erred in harshly sentencing the defendant to sixty (60) years, which is not commensurate with a crime when no one was injured.

Mississippi Code section 97-3-7 (1972) prescribes the punishment for a conviction of aggravated assault shall be imprisonment for no more than twenty years in the penitentiary per conviction.Section 97-3-7(2) of the Mississippi Code of 1972 reads in relevant part, as follows:

(2) A person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; and, upon conviction, he shall be punished by imprisonment in the county jail for not more than one (1) year or in the penitentiary for not more than twenty (20) years.

Miss. Code Ann. 97-3-7 (1972). Miss. Code Ann. 97-3-7 (1972). The trial judge sentenced each of the defendants to fifteen years in the penitentiary for each of their convictions of aggravated assault, well within the guidelines set by statute.

Only Keys frames his issue in terms of the United States Constitution, *i. e.*, because his cumulative sentence was grossly disproportionate to the crime committed, it violated the Eighth Amendment prohibition against cruel and unusual punishment. However, the record of the trial court's sentencing

hearing which it conducted on August 12, 1994, contains nothing to indicate that Keys' counsel objected to his sentence for constitutional or any other reason. In *Reed v. State*, 536 So.2d 1336, 1339 (Miss. 1988), the Mississippi Supreme Court held that the appellant's claim that his sentence was so disproportionate to the crime that it violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution was procedurally barred because he had not presented the issue to the trial judge when the trial judge sentenced him. The supreme court opined:

The appellant contends under this assigned error that the sentence of life imprisonment violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. At the outset, we note that the record reflects appellant did not present to the trial court the proposition that his sentence was unconstitutional, that he may not assert that allegation on appeal, and it is procedurally barred. (citations omitted).

Therefore, this Court holds that Keys' Fourth Issue is procedurally barred pursuant to *Reed*.

Neither did Nick Williams' counsel object to his sentence for constitutional or any other reason when the trial judge imposed the same sentence on him. However, he asserts in his brief that in *Wallace v. State*, 607 So. 2d 1184 (Miss. 1992), the Mississippi Supreme Court adopted the three-pronged test for evaluating the proportionality of a sentence which the United States Supreme Court promulgated in *Salem v. Helm*, 463 U.S. 277, 292 (1983). Nonetheless, the United States Supreme Court effectively reversed *Salem v. Helm* in its subsequent opinion in *Harmelin v. Michigan*, 501 U.S. 957 (1991). In *Harmelin* the Supreme Court re-evaluated the relationship of the proportionality of sentence to the Eighth Amendment. *See Hopson v. State*, 625 So. 2d 395, 404-05 (Miss. 1993) (explaining that even though *Harmelin* questions the proportionality analysis, there is language in the case to indicate that a "gross proportionality" analysis is still in order).

Regardless of the foregoing foray into *Salem* and *Harmelin*, neither Keys nor Williams is entitled to argue that his sentence is so disproportionate to the four crimes of which each stands convicted that it violates the Eighth Amendment to the United States Constitution. They are procedurally barred from raising it for the first time on appeal pursuant to *Reed*, in which the Mississippi Supreme Court reiterated:

[I]t is well settled that the imposition of a sentence is within the discretion of the trial court and this Court will not review the sentence, if it is with in the limits prescribed by statute.

*Reed,* 536 So. 2d at 1339. Both Keys and Williams stand convicted of four counts of aggravated assault, for any one of which the maximum sentence allowed by Section 97-3-7(2) of the Mississippi Code of 1972 is twenty years. This sentence is within the parameters of the statute, and we thus affirm the trial judge's sentences which he imposed on both Keys and Williams.

**Keys Issue 2.**

Whether remarks made by the prosecution during trial and closing argument concerning a similar case that was widely and recently publicized in this rural community appealed to the passions and prejudices of the jury, resulting in lack of a fair trial before an impartial jury.

The prosecutor's remarks which are the subject of Keys' second issue refer to what this appellant

characterizes as "a widely-publicized shooting"Keys placed nothing in the record by which this Court might evaluate the accuracy of his description of this incident as "widely publicized." that occurred outside Picayune on Interstate 59 near the community of Millard some time prior to the trial in the case *sub judice*. That incident involved a few young men from the Picayune area who were followed out of town and at whom shots were fired on the Interstate after a confrontation with a group of individuals from outside the area. The prosecutor's questions about which Keys complains occurred during his redirect examination of Investigator Jeff Wheat of the Picayune Police Department. We quote the following from the record:

Q: Jeff, are you familiar with the circumstances around which Larry Griffith and Teno Causey were followed out of the City of Picayune out on the interstate up to about Millard and shot at by some people that were following them?

A: Yes, sir.

Q: You took the statements in this case; is that right?

A: Yes, sir.

Q: And I want to make it clear that the people that followed Teno Causey and them are not Carlos Keys and Nick Williams, are they?

A: No, they are not.

Mr. Cooper (attorney for Keys at trial): We would object to that.

The record reflects that although the trial judge did not respond to Keys' counsel's objection, the prosecutor pursued the matter of this interstate shooting no further. In *Anderson v. Jaeger*, 317 So.2d 902, 906 (Miss. 1975), the Mississippi Supreme Court delineated the steps to be taken to preserve for appeal an error in the trial judge's evidentiary rulings:

When, in the course of a trial before a jury, it is conceived that something has occurred of a prejudicial nature, an objection must be interposed at the time and the trial court thus be given an opportunity to rule. If the sustaining of the objection should then be considered incapable of removing from the minds of the jury the supposed prejudicial effect of the matter objected to, the court then must be requested to instruct the jury that it be disregarded. If, the trial court having responded by so instructing the jury, the objector should still consider that the interests of his client have been irremediably prejudiced and that the actions of the trial court, although favorable, have not been effective in removing from the minds of the jury the prejudicial effect of the objectionable matter, then a motion must be made at the time for a mistrial. It is not permissible to wait until after a verdict has been returned to raise questions such as this after it has turned out that the verdict is unfavorable. It is too late to raise the point for the first time in a motion for a new trial. The trial court may not be put in error where timely request for a ruling has not been made. Timely objections, followed by appropriate and timely motions, are necessary to preserve such points on appeal.

Although Keys' counsel objected to the third question in this trilogy of queries to which Keys now objects, the trial judge did not even rule on the objection, much less instruct the jury to disregard the answer of Investigator Wheat.

In his brief, Keys argues to this Court that "[t]he prosecution also made a point of showing that these defendants had nothing to do with that case, indicating that this incident was injected into this case for no other reason tha[n] to deprive the Defendant of an impartial jury." However, notwithstanding Rule 103(a) of the Mississippi Rules of Evidence, Keys' counsel stated no specific ground for his objection to these questions.This rule provides:

**(a) Effect of Erroneous Ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(1) *Objection*. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; . . . .

M.R.E. 103(a). Because the trial judge failed to rule on Keys' objection to these questions and because Keys failed to specify the ground for that objection as Rule 103(a) demands, we decide this aspect of Keys' second issue against him.

The second part of this issue concerns the prosecutor's reference to this same shooting incident on the interstate in his closing argument. He said to the jury in his closing argument:

And if you think people won't come after you, especially in shootings, then ask Teno Causey and ask a couple of these other boys from Picayune, the fellows from Picayune that got followed by a bunch out of Slidell and New Orleans, all the way out of Picayune and up to Millard where they opened upon them on the interstate highway in broad daylight with automatic weapons and shot them up. Now, you think that what is going on in Picayune, you think those people don't know what is going on in Picayune and don't have a right to be worried about it?

Keys' counsel did not object to these comments of the prosecutor after he had completed them.

"[I]t is the duty of a trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument, to promptly make objection and insist upon a ruling by the trial court." *Burney v. State*, 515 So. 2d 1154, 1156 (Miss. 1987). Because Keys' counsel failed to object contemporaneously with the prosector's offending statements, he failed to preserve this error for our review.

Regardless of this procedural bar, this Court will review the merit of this portion of Keys' second issue. The Mississippi Supreme Court has established the following test to determine whether improper prosecutorial argument requires a reversal of the appellant's conviction:

The test to determine if an improper argument by a prosecutor requires reversal is whether the natural and probable effect of the prosecuting attorney's improper argument created unjust prejudice against the accused resulting in a decision influenced by prejudice.

*Dunaway v. State,* 551 So. 2d 162, 163 (Miss. 1989). However, "Absent impermissible factors such as commenting on the defendant['s] not testifying, a prosecuting attorney is entitled to great latitude in framing the closing argument." *Id.* In fact, "Generally, attorneys on both sides in a criminal prosecution are given broad latitude during closing arguments." *Ahmad v. State,* 603 So. 2d 843, 846

(Miss. 1992) (citations omitted). Nevertheless, "Given the latitude afforded an attorney during closing argument, any allegedly improper prosecutorial comment *must be considered in context, considering the circumstances of the case, when deciding on their propriety.*" *Id.* (emphasis added).

In his closing argument, Keys' counsel told the jury:

Why didn't they [the four victims] go to the police department right around the corner? Why? They were afraid to do that? No, they weren't afraid. That is where you run to when something happens to you, you go to the Police Department. You don't wait for the police to catch you on the road, to run you down and say, "What has happened?" Then you're going to make something up. Then you're going to tell them a story about what happened to your car, aren't you?

To rebut Keys' argument that Norfleet and McCormick were not afraid and that they had gone to the Nicholson community for some other reason, the prosecutor argued in his rebuttal closing argument:

If you're trying to decide whether those two people, Ricky McCormick and Bob Norfleet, were telling the truth when they said they were scared, and that they ran and that they took off to get away from [Keys and Williams], and they . . . took on off to get out as far as they could away and think things over a minute and come back, remember what Officer Curtis Broughton said. He passed them going in the opposite direction and he turned back around and they pulled over and they came running up to his car. And I asked him what were they like when they got there, and he said that they were terrified, they were terrified. They began immediately telling him what happened and went to the police station. They weren't trying to get away from him.

And if you think people won't come after you, especially in shootings, then ask Teno Causey and ask a couple of these other boys from Picayune, the fellows from Picayune that got followed by a bunch out of Slidell and New Orleans, all the way out of Picayune and up to Millard where they opened upon them on the interstate highway in broad daylight with automatic weapons and shot them up. Now, you think that what is going on in Picayune, you think those people don't know what is going on in Picayune and don't have a right to be worried about it? I'm like Curtis Broughton, if Carlos Keys had been after me, I believe I would have gone farther than Nicholson before I turned around and came back. They were terrified.

This Court finds that the rebuttal closing argument which the State's attorney made and about which Keys complains was entirely appropriate as an explanation of the terrified victims' behavior after the incident. Thus, this Court finds that these statements were not intended to appeal to the jurors' passions and prejudices but instead were offered to rebut Keys' argument that Norfleet and McCormick had fled to Nicholson for some motive other than their fear that Keys and Williams would continue to pursue them for the purpose of harming them.

Perhaps because he realizes that he failed to preserve this aspect of this issue for review by this Court, Keys also argues that the prosecutor's reference to the interstate shooting incident in his rebuttal closing argument was so inflammatory that this Court should review this issue absent the proper objections as a matter of plain error. True, the Mississippi Supreme Court has written:

We have said in numerous cases that even though the remarks complained of may have been improper, the only way to preserve the right to have the matter reviewed on appeal is by objection at

the time the improper remarks are made and moving for a mistrial in the event the court fails to take such action as may be necessary to neutralize the effect of such improper arguments. *It is only when the argument is so inflammatory as to require the entry of the trial judge of his motion that we will review the argument in the absence of objections.*

*Clemons v. State,* 316 So. 2d 252, 253 (Miss. 1975) (emphasis added).

To support his position on this point, Keys cites *Griffin v. State,* 557 So. 2d 542 (Miss. 1990), in which the Mississippi Supreme Court reversed the appellant's conviction because of the prosecutor's comments which he made during his closing argument. *Id.* at 552. The supreme court reversed even though the appellant's counsel did not object to those comments, the subject of which was Griffin's failure to testify. *Id.* Responding to the State's argument that the issue was procedurally barred because Griffin's counsel made no contemporaneous objection to the prosecutor's comments, the supreme court wrote:

This Court, however, has held that, even without a timely objection, reversal may be required when the prosecuting attorney has commented upon the defendant's right not to testify.

In this instance, this Court is of the opinion that the assistant prosecutor's remarks directed the jury's attention to the failure of the defendant to take the stand and admit or deny the contents of the confession and was a direct remark commenting on the defendant's exercise of his constitutional guarantee. In capital murder cases this Court has applied a heightened standard of review, and has reversed where the defendant was not afforded a fundamentally fair trial, even if contemporaneous objection is lacking. This error requires reversal of the guilt/innocence phase of this trial.

*Griffin* at 552.

The *Griffin* case can be distinguished because the prosecutor's remark directly addressed the defendant's constitutional right not to testify against himself. In the circumstances surrounding the case *sub judice*, the prosecutor's comments were intended to counter Keys' argument that if Norfleet and McCormick were as frightened as the State alleged they were, they would have proceeded immediately to the nearby Picayune Police Department rather than driving to Nicholson and then back toward the Picayune area. Even were this Court to find that the prosecutor's remarks were inflammatory, which we reiterate that we do not, we would find *Clemons* applicable and controlling of this aspect of Keys' second issue. As the supreme court opined in *Clemons*: "Under the circumstances of this case, we are of the opinion that the alleged remark was not so inflammatory that we should review it in the absence of a proper objection." *Clemons*, 320 So. 2d at 371. Therefore, we resolve both aspects of Keys' second issue adversely to his position in the issue.

## Keys' Issue 3.

Whether the defendant's constitutional right to effective assistance of counsel was denied.

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to . . . have the assistance of Counsel for his defence." In *Gideon v. Wainwright*, 372 U.S. 335, 345 (1963), the United States Supreme Court held that the Sixth Amendment to the federal Constitution providing that in all criminal prosecutions the accused shall

enjoy right to assistance of counsel for his defense is made obligatory on the states by the Fourteenth Amendment, and that an indigent defendant in a criminal prosecution in a state court has the right to have counsel appointed for him. In *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970), the United States Supreme Court recognized that "the right to counsel is the right to the effective assistance of counsel."

In *Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme Court established the standard by which appointed counsel's representation of an indigent defendant amounted to effective assistance. The Supreme Court then established in *Strickland* that an indigent defendant must demonstrate that his counsel's performance fell below that standard before any court would be warranted in reversing his conviction because his counsel's representation had indeed been ineffective. The Supreme Court opined: "The benchmark for judging any claim of effectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id* at 286.

In *Strickland*, the Supreme Court explained that if an indigent defendant is to prevail in reversing his conviction on the ground that his court-appointed counsel rendered him or her ineffective assistance, that defendant must satisfy both components of his claim that his counsel's assistance was that ineffective. *Id.* The Supreme Court has defined each component as follows:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

With respect to claims of ineffective assistance of counsel, the Mississippi Supreme Court has stated:

When faced with a claim of ineffective assistance of counsel at trial or sentencing, this Court follows the test set down in *Strickland, supra*. . . . This Court set out the test and standards in *Cabello v. State*, 524 So.2d 313 (Miss.1988):

In *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed.2d 674, 693 (1984), the United States Supreme Court established a two- prong test, required to prove the ineffective assistance of counsel: the defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense . . . . The burden of proof then rests with the movant . . . .

Under the first prong, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." . . . In short, defense counsel is presumed competent.

Under the second prong, even if counsel's conduct is "professionally unreasonable," the judgment stands "if the error had no effect on the judgment." ... Consequently, the movant must show that

there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." . . . There is no constitutional right then to errorless counsel . . . .

*Handley v. State*, 574 So. 2d 671, 683 (Miss. 1990) (quoting *Cabello v. State*, 524 So. 2d 313, 315 (Miss. 1988)).

Keys has enumerated five aspects of his trial counsel's performance which he claims were deficient and, thus, prejudiced his right to a fair trial. They are: 1) a complete lack of pretrial investigation; 2) the failure to interview any witnesses; 3) the failure to object to the elimination of black jurors because of their relationship to one or more of the defendants after defendant Nixon was nol-prossed by the State; 4) the failure to interrogate the State's witnesses regarding any attempt to influence their testimony or their alleged offers to drop the charges for money; and 5) the failure to object to the prejudicial statements made by the prosecutor during his closing argument.

This Court's task is to evaluate each of these five challenges which Keys has made to the effectiveness of his trial counsel's representation in accordance with the two components of such a claim which the United States Supreme Court enunciated in *Strickland* in the light of the Mississippi Supreme Court's explanation of its analysis and application of these two components in other cases in which it has reviewed and resolved appellants' claims of ineffective representation by their trial counsel. As the Mississippi Supreme Court instructed the trial bench and bar in *Fisher v. State*, 532 So. 2d 992, 997 (Miss. 1988), if Keys is to prevail in this his third issue, "[H]e must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different."

This opinion renders it obvious that Keys' defense was that of alibi, *i. e.*, he had spent the previous night with his girl friend, who took him to his mother's home around 9:30 a.m., the approximate time that the ambush of Norfleet and the three passengers in his 1986 Buick Regal occurred. To this end, Keys' trial counsel called three witnesses, all of which we previously related. He even managed to prevail upon the State to introduce into evidence as an exhibit the written statement of his girl friend, Roshundrala Price, which supported his client's alibi defense. We think that Keys' alibi defense is relevant to evaluating his complaints about his appointed counsel's ineffective assistance. With these ideas in mind, this Court proceeds to evaluate each of Keys' allegations of the ineffective assistance of his trial counsel.

## A. A complete lack of pretrial investigation

Keys asserts that his trial counsel's complete lack of investigation severely hampered his ability to try the case *sub judice*. In *Cole v. State*, 666 So.2d 767, 776 (Miss. 1995), the Mississippi Supreme Court explained that an allegation of failure to investigate without more is insufficient to establish that defense counsel rendered ineffective assistance:

A defendant who alleges that trial counsel's failure to investigate constituted ineffectiveness must also state with particularity what the investigation would have revealed and specify how it would have altered the outcome of trial or "how such additional investigation would have significantly aided his cause at trial." *Merritt v. State*, 517 So.2d 517, 518 (Miss.1987).

While Keys complains that he never discussed trial strategy with his defense counsel before the trial of this case began, he wholly fails to suggest in his brief how such a discussion "would have significantly aided his cause at trial" or "would have altered the outcome of [this] trial." Neither does he suggest what his client failed to investigate. On the other hand, Keys does not complain of any deficiency in his counsel's preparation of his actual defense of alibi, which we have already mentioned and have previously recited in some detail.

For Keys to succeed on this issue, he must demonstrate specifically that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See Handley v. State*, 574 So. 2d 671, 683. Specifically, Keys has not shown this Court what evidence or facts a more thorough investigation would have uncovered that would have amounted to a probability that would undermine the jury's verdict that he was guilty of the four counts of aggravated assault for which he was being tried. Keys' failure to suggest how additional investigation "would have significantly aided his cause at trial" or "would have altered the outcome of [this] trial" also fails the second component of the *Strickland* test, *i. e.*, a demonstration that this alleged failure to investigate prejudiced his defense. The allegation of failure to investigate is wholly meritless.

## B. The failure to interview any witnesses

The following quotation taken from a concurring opinion in *Moore v. State*, 676 So.2d 244, 246-47 (Miss. 1996) applies to this aspect of this issue:

The record of the trial would not ordinarily reflect the existence of witnesses not called. Here, however, Moore has failed to support his claim sufficiently to allow him to proceed. He does not suggest that there were witnesses to the incident or its aftermath other than those called. He seems to believe that his lawyer could not effectively argue for the lesser included offense without putting on evidence other than that put on by the State. This, of course, is not the case. Even if that were the case, Moore is required to make some showing of the availability of additional probative evidence before he may claim ineffective assistance of counsel.

Melvin Fields is the only witness whom Keys identifies as a witness whom his counsel ought to have interviewed. Picayune Officer Paul Acker, whom we mentioned earlier, interviewed Melvin Fields on the day of the ambush. In his statement, Fields told Officer Acker that only one gunman was involved in the attack on Norfleet and his companions and that the vehicle from which he emerged was blue. Keys notes that Fields' statement contradicts the testimony of the four victims, all of whom insisted that two gunmen fired at them as Norfleet put the pedal to the metal to escape the fusillade which ensued.

The record contains the following direct examination of Sergeant Paul Acker of the Picayune Police Department whom Nick Williams called to testify as part of his case in chief:

Q. Did you meet a Mr. Melvin Fields?

A. Yes, I did.

Q. Sergeant Acker, when you met with Mr. Fields and asked him what happened, what did he indicate to you?

A. He told me that he observed a white car, believed to be a Ford, and a blue car, also believed to be a Ford, pull up at the intersection of Davis Street and Weems Street, and said a few moments later a black male got out of the blue car and began walking towards the white car and shooting at it.

Q. That's what he said, a black male?

A. That's correct.

Q. He indicated one person got out of the blue car and went towards the white car and started shooting?

A. Yes, sir.

Q. He did not say that there were two people involved in this, did he?

A. No.

Q. And he is a completely independent witness who had nothing to do with either the victims in this case or the defendants, did he?

A. Not as I know of.

The foregoing direct testimony of Sergeant Acker, hearsay that it was, provided the jury with the information to which Melvin Fields would have testified had he personally testified. Later, however, on Keys' counsel's direct examination of Sergeant Acker, Acker explained Fields' subsequent hesitancy to testify as follows:

Q. When was the last time you recall stopping and talking to Melvin Fields?

A. About a month and a half or two months ago.

. . . .

Q. He didn't identify any black male that got out of the car?

A. No, not by name.

Q. Did you ask him if he knew the person?

A. I went back to question him again and he advised me that he wasn't going to give any further information because . . . he was new in town and didn't want to jeopardize his grandmother, because she was real old.

This Court interprets the foregoing testimony which Keys' counsel elicited from Sergeant Acker, a witness called by his co-defendant, about Melvin Fields as a classical description of a reluctant witness.

Whether from a sense of fairness or confidence, the State's allowing Sergeant Paul Acker to testify about what Melvin Fields told him to establish the truth of what Fields said presented to the jury what Fields would have testified had Keys' counsel interviewed, subpoenaed, and examined him. Sergeant Acker's testimony that Fields "wasn't going to give any further information" about the incident emphasizes that Keys again has failed to demonstrate that his counsel's interrogation of Melvin Fields "would have significantly aided his cause at trial" or "would have altered the outcome of [this] trial." This second sub-issue has no more merit than did the first sub-issue, and we reject it.

## C. The failure to object to the elimination of black jurors because of their relationship to one or more of the defendants after defendant Nixon was nol-prossed by the State

The following sentence in Keys' brief summarizes his contention on this third sub-issue: "[His trial attorney's failure to move for a mistrial after the jury had been selected] deprived this Defendant of the opportunity to have two other black persons on the jury." He then correctly points out that only one African American sat on the jury which convicted him. Keys acknowledges that had the trial judge in some manner undone the selection of the jury after the State "nol-prossed" its case against Chris Nixon, the State could yet have attempted to exercise two of its peremptory challenges against them, the consequence of which would have been a *Batson* hearing.

Later in this opinion, in response to one of Nick Williams' issues, this Court will hold that the trial court did not err when it denied Williams' "quick" motion for mistrial which his counsel made after the State had dismissed Chris Nixon from the case and after the jury had been selected without objection from either appellant. Our resolution of Williams' issue on this subject also resolves this third sub-issue of Keys' third issue, because if the trial judge committed no error when he denied Williams' motion for mistrial because of the make-up of the jury, then Keys' counsel's failure to make such a motion or to join in Williams' motion hardly constituted "deficient performance," which must first be established under the first component of the *Strickland* criteria.

## D. The failure to interrogate the State's witnesses regarding any attempt to influence their testimony or their alleged offers to drop the charges for money

But for Key's affidavit dated March 2, 1995, which the Mississippi Supreme Court permitted him to file as a supplement to the record by its subsequent order dated June 16, 1995, the record in this case would remain devoid of any reference to the State's witnesses' suggestions to Keys that they would alter their testimony or even drop their charges in return for Keys' payment of money to them. Keys states in this affidavit:

I also requested that counsel interrogate the State's witnesses regarding any attempt to influence their testimony or their offers to me to drop the charges for money. He did not do so.

Nevertheless, Keys' affidavit only supports his assertion that Norfleet and/or some of his passengers attempted to solicit money from him. It certainly does not suggest that there is a reasonable probability that had Keys' counsel cross-examined any of the four victims about this subject, "the result would have been different." As with all three of the earlier sub-issues in this third issue of Keys, we find that he has failed to satisfy both components of the *Strickland* test.

## E. The failure to object to the prejudicial statements made by the prosecutor during his closing

**argument**.

Our resolution of Keys' second issue adversely to him disposes of this fifth sub-issue because if there were no error in the prosecutor's closing argument, as we have decided, then Keys' counsel's failure to object to those "prejudicial statements made by the prosecutor during his closing argument" hardly constituted the "deficient performance," which must first be established under the first component of the *Strickland* criteria.

### F. Summary of Keys' third issue

As the Mississippi Supreme Court appropriately noted in *Handley v. State*, 574 So. 2d at 683, Keys had "no constitutional right . . . to errorless counsel . . . ." The United States Supreme Court admonished that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. The Supreme Court added that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* In other words, Monday morning quarterbacking has no place in an appellate court's review of the issue of effective representation of an indigent defendant by his court-appointed counsel.

Keys' defense was that of alibi. As the Mississippi Supreme Court noted, an alibi defense almost always presents a "classic jury issue." *See Burrell*, 613 So. 2d at 1190. Keys' counsel presented three witnesses and the hearsay statement of a fourth witness to establish Keys' alibi, but the jury rejected it, as indeed it was entitled to do. None of the deficiencies in his appointed counsel's representation of him about which Keys now complains related to the presentation of his alibi. We resolve Keys' third issue against him.

### Williams' Proposition I.

That the court erred in overruling defendant's Motion for Mistrial following the state's nolle prosequi of co-defendant, Chris Nixon, and the court having already excused three (3) Black members of the jury panel, who were close friends of Chris Nixon's family after the *Batson* Rule was invoked.

Williams argues that the three black members of the jury venire excused for cause by the trial court prior to defendant Nixon's being nol-prossed by the State resulted in a jury panel for the other two defendants which was not representative of their peer group. Williams asserts the three jurors were dismissed for cause because of their relationship with Chris Nixon. Williams then argues that because the State dismissed Chris Nixon from the case by way of its motion to nolle prosequi its case against him, the State's motion to nolle prosequi Nixon was "tantamount to the same thing as systematic exclusion of Blacks from jury pools."

First, we remember from our recitation of the events which occurred during the jury's selection that the trial judge excused the three jurors who are the subject of this issue, Ms. Etta D. Bridges, Ms. Stella Roberts, and Ms. Joyce Ford, for cause. Two of them, Bridges and Ford, stated that they knew all three, Keys, Nixon, and Williams, and the third venireperson, Roberts, specifically stated that she knew Keys and Williams. Roberts did not say that she knew Chris Nixon. Williams is incorrect when he asserts that the trial judge excused these three women because they knew only Chris Nixon. As

noted from a reading of this excerpt from the voir dire of the jury, these three black jurors would have been excused for cause whether Chris Nixon was a defendant in this case or not. Not one of these potential jurors was dismissed to purposefully reduce the black representation of the jury. Any argument professing the trial court dismissed these jurors only to exclude blacks from the jury pool is preposterous and lacks any merit. Neither Keys nor Williams objected when the trial judge excused them for cause.

It was before the jury selection process began that the trial judge told counsel for both Keys and Williams that the State had moved to nolle prosequi its case against Chris Nixon. Williams concedes in his brief that "[t]he learned trial judge in an effort to be as fair as possible did offer the remaining defendants a continuance following the dismissal of defendant Nixon." Our earlier recitation of these events included the trial judge's questioning Keys, Williams, and their respective counsel to be as certain as possible that unanimity prevailed among them to proceed.

The record contains the following colloquy among the trial judge and respective counsel for Keys and Williams, the subject of which was the *Batson* rule:

THE COURT: All right. I assume Batson will be used on race.

MR. DUCKER: Yes, sir.

THE COURT: Both Defendants being of the black race. What about gender-neutral reasons, does anybody want to exercise gender neutral or do you-all want to waive gender neutral?

MR. McDONALD: We would also like for the record to show that the alleged victims and both of the defendants are all black.

THE COURT: Sam, do you-all--

MR. COOPER: I will waive gender. I don't see any problem.

MR. DUCKER: Yes, sir.

THE COURT: All right. Then gender won't be considered.

The trial judge, the assistant district attorneys, and counsel for Keys and Williams then commenced to select the thirteen venirepersons who would serve on the jury. Although the record is opaque on the point, it seems that only one member of the jury was African American.

Although Williams invokes *Batson v. Kentucky*, 476 U.S. 79 (1986) in his argument, he fails utterly to relate it to this issue. Perhaps it is because *Batson* is irrelevant to the issue.In the case of *Lockett v. State*, 517 So. 2d 1346, 1349 (Miss. 1987), the Mississippi Supreme Court explained the requirements of *Batson* in the following language:

It is thus clear under Batson 's express terms that a defendant raising a *Batson* claim must show

1. That he is a member of a "cognizable racial group";

2. That the prosecutor has exercised peremptory challenges toward the elimination of veniremen of

his race, and

3. That facts and circumstances infer that the prosecutor used his peremptory challenges for the purpose of striking minorities.

In sum, these components constitute the prima facie showing of discrimination necessary to compel the "state to come forward with a neutral explanation for challenging black jurors." *Batson*, 476 U.S. at 97, 106 S. Ct. at 1723, 90 L. Ed. 2d at 88.

We add this footnote because in the case *sub judice*, the trial judge "assumed" that *Batson* would be invoked, when, in fact, it may never have needed to be invoked. *Batson* and its progeny do not come into play until either the State or the defendant suspects racial or gender discrimination in the selection of the jury by the adversary. Even then, the trial judge must first find that there is a prima facie case of such discrimination before he or she is required to apply *Batson*. Because one side may discriminate with regard to race or gender while the other side does not, there is no need to apply "What's sauce for the goose is sauce for the gander" justice, as it appears may have occurred in the case *sub judice*.

*Batson* applies to peremptory challenges, but not to challenges for cause. Here we are concerned with three challenges of potential jurors for cause.

In *Collins v. State*, No. 94-KA-00850-SCT, slip op. at 9 (Miss. Sup. Ct. Apr. 17, 1997), the Mississippi Supreme Court endorsed this standard of review for determining whether the trial judge erred when he excuses a juror for cause:

Generally, a juror removed on a challenge for cause is one against whom a cause for challenge exists that would likely affect his competency or his impartiality at trial. *Billiot v. State*, 454 So.2d 445, 457 (Miss.1984). Under *Wainwright v. Witt*, 469 U.S. 412 . . . (1985), the U.S. Supreme Court held that deference must be paid to the trial judge who sees and hears the juror, therefore the trial judge's determination that a juror is biased will not be reversed where it is supported by the record. "It is well founded that the trial judge has the discretion to excuse potential jurors for cause if the court believes the juror could not try the case impartially." *Burt v. State*, 493 So.2d 1325, 1327 (Miss.1986).

In the case *sub judice*, all three of the venirepersons whom the trial judge excused for cause testified on *voir dire* that they knew both Keys and Williams. Two of them also knew Chris Nixon. More significantly, they all expressed their personal reservation about whether they could be fair and impartial were they selected as members of this jury. The discharge of Chris Nixon in no way affected their potential lack of impartiality which might have resulted from their knowing Keys and Williams. As we are required to do, we defer to the trial judge who saw and heard these three would-be jurors and affirm his determination that Ms. Bridges, Ms. Roberts, and Ms. James were biased because we find that his determination was supported by the record. Our finding rests on the testimony of all three venirepersons that they knew Keys and Williams. In fact, only two of them testified that they knew Chris Nixon. Again, we resolve Williams' first issue against him and affirm the trial judge's denial of his motion for mistrial.

**Williams' Proposition IV.**

That the multi-count indictment includes four (4) counts of aggravated assault which should have been considered as one event.

Until the passage of Section 99-7-2 of the Mississippi Code of 1972, which became effective from and after July 1, 1986, the Mississippi Supreme Court had prohibited multi-count indictments. *See McCarty v. State*, 554 So. 2d 909, 914 (Miss. 1989) (explaining that the Court had "veered away from approving single multiple count indictments because of the possibility of the pyramiding of multiple punishments growing out of the same set of operative facts"). Now, however, Section 99-7-2 permits multi-count indictments under certain circumstances.Section 99-7-2 reads in relevant part:

(1) Two (2) or more offenses which are triable in the same court may be charged in the same indictment with a separate count for each offense if: (a) the offenses are based on the same act or transaction; or (b) the offenses are based on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan.

(2) Where two (2) or more offenses are properly charged in separate counts of a single indictment, all such charges may be tried in a single proceeding.

Miss. Code Ann. 93-5-23 (1972).

A motion for severance of offenses pursuant to what was then Rule 4.04 of the Uniform Criminal Rules of Circuit Court Practice seems to have been the appropriate method of challenging the grand jury's returning a multi-count indictment of a defendant.Rule 4.04 of the Uniform Criminal Rules of Circuit Court Practice read in relevant part:

The court may, on motion of the state or defendant, grant a severance of offenses whenever:

(1) If before trial, it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense; or

(2) If during trial, upon the consent of the defendant, it is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offense.

UCRCCP 4.04. In footnote 3, we noted that by order of the Mississippi Supreme Court the Uniform Circuit and County Court Rules became effective on May 1, 1995. Rule 9.03 of the Uniform Rules of Circuit and County Court is identical to Rule 4.04 of the Uniform Criminal Rules of Circuit Court Practice. *See Corley v. State*, 584 So. 2d 769, 772 (Miss. 1991) (stating that [w]hen a defendant raises the issue of severance, [the Mississippi Supreme Court] recommend[s] that a trial court hold a hearing on this issue). We have searched both the clerk's papers and the transcript of the trial to locate Williams' motion for a severance of offenses for which Rule 4.04 provided, but we have found none. Of course, without a motion for severance of the offenses, the trial judge remained unaware that Williams objected to being tried on the four-court indictment, and the trial judge was denied the opportunity of deciding the question of whether proceeding to try Williams on the four-count indictment was error.

In *Robinson v. State*, 662 So.2d 1100, 1104 (Miss. 1995), the Mississippi Supreme Court reminded the Bar that "[W]e have said that a trial judge cannot be put in error when he was not given the opportunity to address the issue." In *Berdin v. State*, 648 So.2d 73, 80 (Miss. 1994), the Mississippi

Supreme Court explained:

Both Berdin and the State raised issues under assignment number II that are procedurally barred. Berdin never raised this issue at the hearing for post-conviction relief. It is assigned as error for the first time in her brief. An assignment of error may not be raised for the first time on appeal. Therefore, this issue is not properly before the court.

(citations omitted). Thus, this Court holds that Williams' fourth issue is procedurally barred because he never afforded the trial judge an opportunity to decide it.

Although this issue is procedurally barred, *Blanks v. State*, 542 So.2d 222, 225 (Miss. 1989) demonstrates that no error was committed by the trial of Williams under the indictment which contained four counts, each of which charged him with aggravated assault. Blanks had been convicted of murder and aggravated assault, both of which charges were included in the same indictment as two separate counts. *Id.* The supreme court held that under the circumstances of the case, the two-count indictment was proper. *Id.* The supreme court explained:

The offenses charged against Buddy Blanks were properly consolidated into a single, multi-count indictment. Both the murder and the aggravated assault arose from a single fusillade, certainly a single transaction, episode or event. Blanks presented the same defense to the two charges -- self-defense. Practically, all of the evidence admissible against Blanks on the murder count was also admissible against him on the assault count, and vice versa. No legally cognizable prejudice could be said to have resulted from the consolidation at trial of the two charges. *See Davis v. State*, 476 So.2d 608, 609 (Miss.1985) (evidence relating to two shooting victims admissible in trial on one charge of aggravated assault where both crimes "interwoven and close in point of time").

*Id.*

In the case *sub judice* there was one fusillade of bullets which occurred during a single transaction. Williams' defense to all four counts was the same -- an alibi. Almost all of the evidence admissible on one count of aggravated assault was admissible on the other three counts, with the possible exception of Norris Jackson, who testified that after he had fallen from Norfleet's rapidly accelerating Buick Regal, he saw both Williams and Keys firing at him as he scrambled to the cover of some nearby woods.

Relevant to this issue is *Berry v. State,* 16 So. 2d 629 (Miss. 1944), in which the Mississippi Supreme Court affirmed the conviction of man accused of shooting two women with one shotgun blast. The appellant was acquitted of the charge as to one of the women, but was found guilty as to the assault on the other woman. On appeal Berry argued that "the previous acquittal bars a prosecution on the indictment now before us." *Id.* The question which begged analysis was "whether there may be more than one prosecution where different persons are killed or wounded by a single shot or blow *or by the same act." Id.* (emphasis added). The supreme court illustrated its affirmance of Berry's conviction as follows:

If, for instance, knowing that a person is alone in a house and is so ill as to be unable to move, an accused sets fire to the house in order thereby to burn to death the disabled person, and such is the result, there would be but one act, the setting of the fire, but there would be two offenses, arson and

murder, one against the person and the other against the property. If, then, there were two disabled persons in the house, like reason would produce the result that three offenses were committed. To pursue the illustration further: Had one of the inmates succeeded, although severely burned, in crawling from the fire, and thereby survived, it would hardly be contended that the conviction or acquittal of the accused for the attempt upon the life of the survivor would bar a prosecution for the murder of the other. Thus, in point of law, the offenses are distinct, although the product of a single act.

*Id.* at 629-630.

We summarize our analysis and resolution of Williams' fourth issue by finding it procedurally barred, but, notwithstanding the procedural bar, holding that the four-count indictment was proper under the facts of this case. Thus, even though we have no trial judge's decision which we may affirm, we resolve Williams' fourth issue against him.

## V. SUMMARY

None of the jury's verdicts of Keys' and Williams' guilt of aggravated assault was against the overwhelming weight of the evidence. While discrepancies occurred in the testimony of Jackson, Norfleet, McCormick, and Van Buren, especially about the description and color of the vehicle from which their assailants emerged, it was the duty of the jury to resolve those discrepancies by deciding which witnesses they believed and which they didn't. Keys' and Williams' defense of alibi created a "classical jury issue." The jury rejected the testimony of Keys' and Williams' defense witnesses, as it was their prerogative so to do. The trial judge did not err when he denied the Appellants' motions for new trial.

The sentences of both Keys and Williams to serve fifteen years on each individual count of aggravated assault were all less than the maximum of twenty years for one conviction of aggravated assault prescribed by Section 99-7-2 of the Mississippi Code of 1972. That the trial judge required that these sentences run consecutively was within his discretion. While Keys failed to preserve for appeal the issue of whether his sentence was so disproportionate to the crimes for which the jury had convicted him as to violate the Eight Amendment's prohibition against cruel and unusual punishment, our earlier analysis of *Helm, Harmelin,* and *Hopson* led this Court to the conclusion that had the error been preserved, we nevertheless would have affirmed the sentence which the trial judge imposed on Keys. Thus, we have affirmed Keys' and Williams' sentences which the trial judge imposed on them.

We decline to hold that the prosecutor's questioning Investigator Jeff Wheat about another ambush on the interstate was error because Keys' counsel objected to the last in the series of the three questions about the other incident, but the trial judge never ruled on that objection. This Court should refrain from holding a trial judge to have been in error for a decision he never made. Moreover, the prosecutor made it quite clear that neither Keys nor Williams had anything to do with the other shooting incident out on the interstate. As for the prosecutor's reference to the same incident during his closing argument, Keys' counsel never objected to it, a *sine qua non* to preserving this issue for our review in the absence of plain error. Again, however, we have also found that the

prosecutor's reference to that incident was his effort to counter Key's closing argument that if Norfleet and McCormick had been frightened, they would have driven immediately to the police department in Picayune rather than to the community of Nicholson before they returned to the Picayune area.

Keys must similarly fail on his claim that his trial counsel was so ineffective that his right to counsel granted by the Sixth Amendment was violated. This Court dealt in some detail with each of his complaints previously in this opinion, but we found nothing to erode our confidence in the outcome of the trial. Especially is this true since Keys' trial counsel presented and, we think, effectively questioned three witnesses and obtained by stipulation of the State the introduction into evidence of the statement of Keys' girlfriend to establish Keys' alibi. That the jury rejected Key's defense of alibi carries no connotation that Keys' trial counsel's representation of his client was ineffective.

We reject Williams' claim that the trial judge erred when he denied his motion for mistrial after the jury had been empaneled but before the trial began because the trial court had sustained the State's motion to nolle prosequi the case against the third defendant, Chris Nixon. We reject it because the trial judge excused the three African American female jurors for cause without objection from either Keys or Williams. The trial judge did not excuse them in response to peremptory challenges by either the State or either of the appellants. Thus, *Batson* and its progeny have no relevance to this issue, Keys' argument notwithstanding. The record demonstrates that all three of these venirepersons knew both Keys and Williams and that all three of them indicated in response to the trial judge's questions that they could not be impartial jurors because they knew Keys and Williams as well as Nixon. Thus, we have affirmed the trial judge's denial of Keys' motion for mistrial on this basis.

Williams never presented his grievance about the four-count indictment to the trial judge, whether by way of motion for severance of the offenses or any other motion. Thus, yet another of his issues remains procedurally barred. But regardless of the procedural bar, we have held that *Blanks v. State* readily supports the grand jury's having returned the four-count indictment against Williams.

Finally, we note that while Keys initiated the appeal *in forma pauperis*, he subsequently employed his own counsel to represent him in this appeal. Keys' retained counsel entered his appearance in the Mississippi Supreme Court before it transferred this case to this Court. This Court therefore no longer recognizes Keys as appealing *in forma pauperis* and does therefore assess one-half of the costs of this appeal personally to Keys. It assesses the remaining one-half of the costs of this appeal to Pearl River County because Williams' appeal *in forma pauperis* was authorized by order of the Circuit Court of Pearl River County and was completed by the attorney whom that court appointed to represent him in this appeal.

**THE PEARL RIVER COUNTY CIRCUIT COURT'S ORDERS OF CONVICTION OF THE APPELLANTS OF FOUR COUNTS OF AGGRAVATED ASSAULT EACH AND ITS SENTENCES OF APPELLANTS TO SERVE TERMS OF FIFTEEN YEARS FOR EACH COUNT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, EACH SENTENCE TO RUN CONSECUTIVELY TO THE OTHERS, ARE AFFIRMED. THE COSTS OF THIS APPEAL ARE TAXED IN EQUAL SHARES TO THE APPELLANT, CARLOS KEYS, AND TO PEARL RIVER COUNTY.**

**BRIDGES, C.J., McMILLIN AND THOMAS, P.JJ., DIAZ, HERRING, HINKEBEIN, KING,**

**PAYNE, AND SOUTHWICK, JJ., CONCUR.**